·JOHN S. DYGERT, Respondent, v. GEORGE REMERSCHNIDER and CATHARINE REMERSCHNIDER, impl'd, &c., Appellants.

An oral agreement to marry, and pay the then existing debts of the proposed husband, in consideration that he convey to the proposed wife certain premises of which he is the owner, if fully performed by the wife, is valid and binding in equity upon the husband; and a conveyance made to her of the premises in pursuance thereof, is upon a good and sufficient consideration.

Every agreement, promise or undertaking, made upon consideration of marriage, unless in writing and subscribed by the parties, is void; and a settlement made subsequently in pursuance of such void agreement, is invalid as against creditors.

A judgment creditor of the husband who became a creditor subsequent to such agreement, but who obtained judgment prior to the conveyance of the premises, cannot impeach such conveyance.

A voluntary conveyance is not *per se* fraudulent as to creditors; whether it be fraudulent is a question of fact for the jury.

DAVIS, J.   The plaintiff is a judgment creditor of George Remerschnider on a judgment recovered in January, 1862, upon a debt contracted in October, 1860.   He seeks to reach certain premises conveyed in June, 1861, by George Remerschnider to one Egiler, and by Egiler to Catharine Remerschnider, the wife of George.   From the facts found by the court at Special Term, it appears in substance, that in 1854 George, then a widower of 53, owned the premises in question, which were then worth about $700, and was in debt about the same amount.   Catharine was then a spinster of 24, a tailoress by occupation, and possessed of her own earnings and of money brought with her from Germany, the sum of $151.26.   George proposed marriage to her, and after some negotiations with a view to that end, an oral agreement was made between them, by which George agreed, in consideration of her promise to intermarry with him and to pay off the debts he then owed, to convey to her the premises now in question.   The debts were ascertained to be between six and seven hundred dollars, but turned out to be a little more than seven hundred dollars.   The parties intermarried. Catharine paid on George's debts the money she then had

and by diligence at her trade had earned, and with the con-sent of her husband paid off, before the debt was contracted for which the plaintiff recovered his judgment, all the remain-ing indebtedness of George, amounting to about $550. In this interval, George had frequently promised to convey the premises to her — always acknowledging his liability to do so but putting off the execution of the conveyance from time to time.

It thus appears that before the debt to plaintiff was con-tracted, Mrs. Remerschnider had fully performed the oral agreement on her part by intermarrying with George and by paying in full all his debts in the manner above stated, and there existed no creditors to dispute the validity of the trans-action. If the husband had then conveyed to her the premises in accordance with the oral agreement, a subsequent creditor of his could not have attacked and overthrown the conveyance on the ground of fraud. The conveyance would not have been voluntary in any proper sense of that term, but founded on a good and valuable consideration. The court having found, as must be inferred from his legal conclusion, that as matter of fact the subsequent conveyance was made in good faith and with no intent to defraud plaintiff or any creditor of the husband, it seems to me that the real question in the case is, whether Mrs. Remerschnider had rights at the time she had finished the payment of her husband's debts which a court of equity would have recognized and enforced against him. Under the authorities, I think she had no rights based solely upon the consideration of marriage which courts, either of law or equity, could have enforced. The statute of frauds declares void every agreement, promise or undertaking made upon consideration of marriage, unless in writing and sub-scribed by the parties to be charged therewith. (2 R. S., 135, § 2.) And it is settled by authority, that a settlement made subsequently in pursuance of such void agreement, is invalid as against creditors. (*Read* v. *Livingston*, 3 Johns. Ch., 481; *Borst* v. *Cary*, 16 Barb., 136, and cases there cited.) The plaintiff was an existing creditor at the time the premises were conveyed to Mrs. Remerschnider, and so the settlement

cannot be sustained against him on the fact that it·was the consummation of an agreement based upon an executed promise of marriage. But the agreement found in this case had another consideration sufficient to uphold it after its execution in good faith and with no intent to defraud creditors; and that was, the promise of Catharine to pay off the debts of the husband and her actual payment of them to the full value of the land. Where A. agrees orally with B. to sell and convey to him certain lands for a stipulated price, the agreement is void under the statute although the price be fully paid, and it is only where equity is permitted by its settled rules to give relief by specific performance that the purchaser has any remedy. But if after such an agreement is made and the price paid, A. himself conveys the land in good faith pursuant to it, before any creditor has acquired a lien, I do not think the conveyance could be attacked by creditors either as fraudulent or voluntary. The party who has thus paid his money under an agreement which the courts would not enforce, · is himself a creditor having in addition a moral claim that his debt shall be paid in the manner agreed upon by the conveyance of the land; and when his debtor recognizes the force of that moral obligation and pays the debt with the property, all intent to defraud being out of the case, I am not able to see any principle that permits another creditor to interfere with it.

When Mrs. Remerschnider intermarried with her husband, an oral agreement existed between them by which she promised to pay his debts to the full value of the premises, and he to convey to her the premises on her doing so. The force of this promise was preserved so far as any consequence of the marriage is concerned, by section 3 of chapter 375 of the Laws of 1849 (Sess. Laws of 1849, page 529), which enacts that " all contracts made between persons in contemplation of marriage shall remain in full force after such marriage takes place." (*Powers* v. *Lester*, 23 N. Y., 530.) Pursuant to this agreement, Mrs. Remerschnider immediately paid $151 of her separate property to apply upon it. So far, there was nothing inequitable or unjust in the conduct of the parties. The.

creditors of the husband reap the advantage of a performance of the agreement by the payment, so far as her moneys would go, of their demands. From that time forward for several years Mrs. R., while discharging the duties of a wife and mother, earned at her trade several hundred dollars, which her husband consented and agreed (as the court has found) should be hers to enable her to perform her contract. This money, from time to time and as rapidly as earned, she applied to the payment of the debts she had agreed to discharge till finally she had extinguished the whole. There then existed no creditor to complain of her husband's consent to her having the fruits of her toil, for that very consent had enabled all of them to receive their pay in full. I am at a loss to see what right a long subsequently accruing creditor has to impeach the gift by her husband to her of the earnings of her labor. If he had received the money himself and then handed it to her as his gift, no after-born debt could assail his act. She would then have been at liberty to have paid it on this contract or elsewhere, as she chose, without being called upon to deliver it to some future creditor of her husband. Now, the rights of all existing creditors being disposed of, I do not see how one arising six years afterwards has any equitable right to attack the gift of·her husband to her of the earnings of her own labor. That gift was completely executed the moment, with his consent, she received the money and applied it to her own use by paying it to others in discharge of an obligation she had assumed. Nor do I think the husband would have the right to deny her performance of her agreement on the ground that she had paid the money he himself had given her. She stood, therefore, in my judgment, before the debt to plaintiff existed, as one who has an oral agreement for the conveyance of land fully performed on his part. Good conscience required that the husband should perform on his; and according to the findings of the court he has done nothing but this, with no intent to defraud his creditors, but in good faith keeping an agreement where the grossest injustice would have resulted from his not doing so.

I do not see why Mrs. Remerschnider should not be permitted to retain the property.  Her equity was prior in time; it ripened into title before the plaintiffs acquired any lien, and unless courts of equity are prepared to hold that contracts for the sale of lands void under the statute shall not be performed by mutual consent of the parties, but are to be set aside when completely executed with no fraudulent intent, the judgment of the Special Term should be upheld.  I am for reversing the judgment of the General Term and affirming that of the Special Term.

WRIGHT, J.    The action was in the nature of a creditor's bill to reach certain real estate alleged to have been fraudulently transferred, and choses in action of the defendant George Remerschnider.  The real estate, described in the complaint, the conveyance and transfer of which to the defendant Catharine Remerschnider the plaintiff sought to avoid as to him, consisted of a house and lot in the village of Canajoharie, and a lot containing three $\frac{98}{100}$ acres contiguous thereto.

The cause was tried at a Special Term, held in the county of Schenectady, in March, 1863, and the plaintiff's complaint dismissed.  The judge holding the term found as facts:

That on the 27th January, 1862, the plaintiff recovered a judgment in the Supreme Court against the defendant George Remerschnider for the sum of $207.90, and $61.04 costs, upon a debt contracted by the said George, on the 3d October, 1860, and which judgment was docketed in the clerk's office of the county of Montgomery on the 27th day of January, 1862.  That an execution was duly issued upon such judgment to the sheriff of the county of Montgomery, and afterwards the same was returned wholly unsatisfied, and that no part thereof has been paid.

That on the 3d day of June, 1861, the defendant George Remerschnider, conveyed by deed the premises described in the plaintiff's complaint to John Egiler, and on the same day John Egiler conveyed the same premises to Catharine Remerschnider, the wife of said defendant George.

That on or about the month of February, 1861, one Nelson

Timerman borrowed $75, which he received from the hands of the defendant Catharine Remerschnider, upon a note payable to the defendant George Remerschnider ; and that after the plaintiff's action was commenced the note was changed and a new note given in its place, payable to Catharine, his wife. The money borrowed was Catharine Remerschnider's money ; that the note by mistake was made payable to George Remerschnider ; that none of it belonged to her husband, George Remerschnider.

That in 1854, George Remerschnider was a widower, residing in Canajoharie, Montgomery county, about 53 years of age, owning the real estate in question, in two parcels, then worth about $700 ; was in debt about the amount of the value of his said real estate ; that he had very little personal estate ; was addicted somewhat to drinking ; was by trade a mason, working when he could get jobs, and earning about $100 a year ; was embarrassed with his debts ; some of them were then in judgment, and that constables about that time were advertising his personal property on execution.

The defendant Catharine, then Catharine Egiler, was a tailoress, about 24 years of age ; then recently from Germany ; and earning money at her trade. That George Remerschnider was introduced to her and offered her marriage ; that after some negotiations on the subject, and on the subject of his property and debts, and after ascertaining his debts to be between $600 and $700, a parol antenuptial contract was made between them, in substance, as follows : That George Remerschnider was to convey to her his real estate, and she was to marry him and pay his debts. In consideration of this agreement, the marriage was consummated. That she had some money coming from Germany, which was to be applied by her in the payment of his debts. That she did subsequently pay all the debts he then owed, exceeding the amount of $700. That the said Catharine then had of money from Germany, and from her earnings, a total of $151.26, which she then applied to his debts. That the remainder of the $700 being about $550, was earned by

her at her trade after marriage with the assent and agreement of her husband.·

That from the time of the marriage of the said George Remerschnider to the defendant Catharine Egiler, up to the time the deeds of conveyance were executed by the said George, the said Catharine frequently requested the said George to convey to her said premises in pursuance of said antenuptial agreement; that he had often promised to convey the same, but did not convey until the 3d day of June, 1861.

As a conclusion of law upon these facts, the judge found and decided that the said Catharine Remerschnider is entitled to hold the lands set forth in the plaintiff's complaint, unaffected by the subsequent creditors of her husband; and that the plaintiff's complaint be dismissed with costs.

The plaintiff filed and served exceptions to the conclusions of law and fact of the judge.

Judgment was entered at Special Term in conformity with the decision. The plaintiff appealed to the General Term, where the judgment of the Special Term was reversed and a new trial ordered on pleading and process of law.

From the order granting a new trial, the defendants, Catharine Remerschnider and George Remerschnider, appeal to this court, stipulating that if the order be affirmed judgment absolute may be rendered against them.

We may lay out of view any question touching the Timerman note of seventy-five dollars. That was given for money borrowed from Mrs. Remerschnider, and was not a chose in action of her husband. The circumstance that the note was originally made payable to the latter, is of no importance, as it occurred by mistake. It was the wife's money that was loaned, and not the husband's.

The only question then to be considered, relates to the real estate. On the 3d of June, 1861, the defendant George Remerschnider conveyed it to John Egiler, and on the same day Egiler conveyed it to the defendant, Catharine Remerschnider, the wife of George. The plaintiff, at this date, was a creditor of George Remerschnider, the latter, on the 3d of October, 1860, having contracted the debt for which the plaintiff

recovered the judgment against him in January, 1862. The conveyance, it is claimed, was, as against the plaintiff, a creditor of the grantor, fraudulent and void.

The General Term, adopting the theory that it was a voluntary transfer made by a husband to his wife, or for her benefit, and as the plaintiff was at the time a creditor of the husband, the transfer was, as matter of law, fraudulent and void as against him. This must have been the ground, as there was no finding that the conveyance was made with intent to defraud the plaintiff or any other of Remerschnider's creditors, or any facts indicating such intent. The position is not maintainable. A voluntary conveyance of an estate or interest in lands, is not *per se* fraudulent, even as to existing creditors. It is not enough to show that the deed was without consideration, and that the party who seeks to avoid it was a creditor antecedent to or at the time of the transfer. The statute avoids every conveyance of any estate in lands, made with the intent to defraud creditors (2 R. S., 137, § 1); but it is not a presumption of law, from the fact that the conveyance is without consideration, that it is fraudulent as to them. It is declared that the question of fraudulent intent arising under the provisions of the chapter of the Revised Statutes, entitled " Of fraudulent conveyances and contracts relative to real and personal property," shall be deemed a question of fact and not of law, and that no conveyance or charge shall be adjudged fraudulent as against creditors or purchasers, *solely* on the ground that it was not founded on a valuable consideration. (2 R. S., 137, § 4.) Where a conveyance is voluntary from a husband to a wife, or a parent to the child, and the grantor is indebted at the time, the indebtedness is a circumstance bearing on the question of fraud; but whether the particular transaction is intended as a fraud upon creditors, is a question of fact. Of course the conveyance by a party of his property by way of a gift, or without consideration, and having creditors at the time, are circumstances to be weighed by the tribunal whose province it is to ascertain the facts in determining fraudulent intent as respects his creditors. It does not follow as a con-

clusion of law, from a conveyance being voluntary, that the intention in making it was to defraud such creditors; but whether this was or was not intended by the transaction, is a question for the tribunal that determines the facts. It may be, in a particular case, that the circumstances are utterly inconclusive as to an intent to commit a fraud upon creditors. Where a person possesses a large estate, and owing debts of inconsiderable amount, makes a voluntary settlement of a part of his property upon a wife or child, retaining enough of his property himself to pay many times over existing debts, it would be no fair or reasonable inference to be drawn from such a transaction that it was intended to hinder, delay or defraud the persons to whom he happened to owe some trifling debts.

In cases, then, of voluntary conveyance of property, the fact must be found that a fraud upon the grantor's creditors was intended by the transfer, or at least the facts of the case must conclusively indicate such intent. In the present case, regarding the transaction simply as a voluntary settlement of real estate by Remerschnider on his wife, upon the facts as they appear by the finding of the judge, the plaintiff, I think, was not entitled to have the transfer set aside. It is found that he was a simple contract creditor of Remerschnider; but there is no finding of actual and intentional fraud. In this view of the case, apart from the effect of the parol contract before marriage, all the facts presented are that Remerschnider, on the 3d June, 1861, conveyed to his wife real estate to which he then had the legal title, and that when such conveyance was made, he was a debtor of the plaintiff. The fact is not found, nor does it appear in any way, that the conveyance was made with intent to defraud the plaintiff or other creditors of the grantor. It seems to have been assumed at General Term, that if the conveyance was to be deemed voluntary, it was *per se* fraudulent as against his existing creditors.

But if this be an erroneous view to take of the case as the record presents it, I am still of the opinion that it was correctly disposed of at the Special Term.

Two questions are presented: 1st, Was the conveyance or transfer of the 3d January, 1861, voluntary? 2d, If voluntary, was it fraudulent as to the plaintiff? If the first inquiry requires a negative answer, the second will, in effect, be answered against the plaintiff. Whether the transfer was voluntary — a mere gift from husband to wife, in legal contemplation — is to be answered by a reference to the agreement made in 1854, between Remerschnider and his wife, then Catharine Egiler, a single woman. If this were an agreement simply to convey the real estate in question to her, in consideration of marrying Remerschnider, being by parol, it would be void by the statute of frauds (2 R. S., 135, § 2), and any conveyance or transfer of the property after marriage, in pursuance of such void agreement, it may be conceded, would be, as against existing creditors of Remerschnider, in contemplation of law, voluntary. But this, I do not think, was the nature and purport of the contract. It did not rest solely, or even principally, upon the consideration of marriage. Remerschnider owned the real estate, which was of the value of about $700, and owed debts to that amount, with no other means to pay them. He agreed to convey the property to her, and in consideration whereof she agreed to pay his debts and marry him. It was a part of the agreement that she was to apply her own then accumulated means in payment of the debts, and she did actually apply, of such means, something over $150. Now this was not a marriage contract only, or rather one where marriage was the single consideration, and necessarily falling within the condemnation of the statute of frauds, not being in writing. I think it may be rightly regarded as an agreement for the purchase of the real estate between parties at the time legally competent to enter into it. Adding to a money consideration that of marriage, I think, did not alter its character of a contract of purchase; and intermarriage subsequently, as respected Remerschnider, gave to it another and different legal effect. After marriage, as before, it subsisted (Laws of 1849, ch. 375, § 3), and might have been enforced in equity against Remerschnider, though he

became her husband after full payment of the purchase-money, viz., his debts. (Code, § 114, sub. 2.) Contracts between husband and wife, before marriage, are not now, as at common law, extinguished by their matrimonial union. The fact is found that she fully performed the agreement on her part. She paid all the debts, exceeding the amount of $700, partly, it is true, from earnings by her, at her trade, as a tailoress after marriage. These earnings, it is said, belonged to her husband; but suppose they did, he could give them to her so long as nobody was to be defrauded thereby. The plaintiff certainly was not in a condition to question the gift, for no rights of his, as a creditor of Remerschnider, it is pretended, attached until after the debts had been fully paid.

The agreement being, then, one of purchase, and having been fully performed by Mrs. Remerschnider, what were the rights of the parties to it, as between themselves? It is to be remembered that there was no creditor to be defrauded; and in law, I think, she was as much a *femme sole* as to it then, as she was when it was made. Having performed, herself, equity demanded that Remerschnider should perform on his part; and a court of equity would have enforced such performance on application in her behalf. Remerschnider, however, who was the only person to question the invalidity of the contract as one by parol for the sale and conveyance of lands, interposed no objection of that kind, but performed by executing the deed of June 3d, 1861. He did then, what in equity ought to have been done before the plaintiff became his creditor.

In this view, the conveyance or transfer of June, 1861, is not to be deemed voluntary — a gift — and open to attack by the plaintiff, a creditor at large of Remerschnider when it was made, but no creditor when Mrs. Remerschnider's rights as a purchaser became perfect under the agreement of 1854, and she was equitably entitled to a conveyance. It was not a voluntary transfer of property by a husband to a wife, but the performance by Remerschnider, as equity bound him, of a prior valid agreement for its purchase. Because Remerschnider omitted to do this, when in equity he should have

done it, until after he had contracted the plaintiff's debt, I do not think gives the latter the right of insisting in a court of equity that his claim should be preferred.

The order granting a new trial should be reversed, and the judgment of the Special Term affirmed.

POTTER, J. This was an action in equity brought to set aside conveyances made to the defendant Catharine Remerschnider, as being without consideration, and as fraudulent in fact; it was heard at Special Term on pleadings and proofs. The judge at Special Term found that there was no fraud in fact in the conveyances, and that there was a good consideration to support the deeds, and that there was no fraud in law in the transaction in question, and dismissed the complaint. The General Term reversed this judgment upon the law, but conceding the facts to have been correctly found. The facts are simple and brief. In 1854, Catharine Egiler (now the defendant Catharine Remerschnider), then lately from Germany, was a *femme sole*, a seamstress, aged 24, was earning money at her trade, and had of her earnings, and some moneys received and some in expectancy from Germany, in all, a sum amounting to about $151. George Remerschnider, a widower, aged 54, had two lots of real estate of about the value of $700, and was in debt to about its full value, a mason by trade, quite embarrassed, and capable of earning but little in his business, offered marriage to Catharine. Catharine inquired as to his pecuniary condition, and was told by him what it was. She consented to marry him on condition that if he would convey to her his real estate, she would pay his debts, applying thereto all the moneys expected from Germany. This proposition was accepted, and they were married. Each knew the means of the other. The only means of paying his debts was the $151 of Catharine and her earnings at her trade, in other words, $151 was the whole present and future money capital of both parties, his debts being equal to the value of his estate. Immediately upon the marriage she took possession of the real estate. She first applied her present means to his debts, with which, and

with her subsequent earnings, she paid them all.  She fre-
quently demanded of him the performance of his agreement
to convey to her this real estate, which he continued to omit
to do.  Five or six years after this agreement, George Rem-
erschnider, her husband, indorsed a note for some firm of
persons, which note came to the plaintiff's hands, who, in
1861, commenced his action thereon against George Remer-
schnider and obtained a judgment thereon.  After the com-
mencement of this action, George made a conveyance of the
property in question to a brother of Catharine, who on the
same day conveyed the same to Catharine.  There was no
other consideration for these conveyances than the agreement
made before marriage, and the performance on her part as
above stated.  After the plaintiff obtained his· judgment
against George, he filed his complaint to set aside the said
conveyances as fraudulent against him, as a creditor of George
Remerschnider.  The General Term reversed the judgment
of the Special Term on the ground that the agreement be-
tween George and Catharine was a mere parol, executory,
antenuptial agreement, which, not being executed until after
marriage, was void by the statute of frauds for not being in
writing; and also, that by the intermarriage and union of
the parties, the contract thus became void; that the execu-
tion of the agreement after marriage amounted to a voluntary
settlement by George upon his wife, which was void, even as
against the· plaintiff, a subsequent judgment creditor.  In
this they reversed the judgment of the Special Term, who
held that though this was a parol antenuptial agreement, it was,
nevertheless, a contract of purchase which could have been
enforced in equity.  This presents the whole question.  The
General Term was in error.  Leaving, for the present, the
question of the consideration of marriage, and the discussion
of the rights of creditors who only could call in question this
conveyance, the agreement is first to be examined as one
between George and Catharine, the parties, and settle the
equities between them; because in regard to this question,
they are to be treated as hostile parties.  The payment by
Catharine of. $151 was not only a good consideration, but

was a valuable consideration by all the authorities. "A valuable consideration is something mutually interchanged between the parties. It is not necessary that they should be of equal value." (2 Black. Com., 297, 444; 4 Kent's Com., 462.) So that whatever may be the real value of the consideration of marriage, the money itself, advanced by Catharine from her own means, independent of marriage, was a sufficient consideration. Mere inadequacy of consideration is no ground for declaring a conveyance void. (1 Bald., 356.) Marriage is also as valuable a consideration as property; though it cannot be estimated in money, it will be sufficient to support an agreement. A valid contract made in consideration of a future marriage creates a legal and an equitable obligation to perform it in good faith. If the contract is executed, the parties become purchasers. If it remains executory till after marriage, they become creditors until after its consummation. If executed only in part, they are entitled to the protection of all courts in enjoining what is granted, and their aid in enforcing performance of what remains to be done; and if either party voluntarily perform what a court would compel to be done, it would be as valid as if done by its judgment, or as if its executions had been completed on the day of the contract. (*Maginea* v. *Thompson*, 1 Bald., 356, *et seq.*; *Hindes' Lessees* v. *Longworth*, 11 Wheat., 199.)

This contract was made after the taking effect of the statutes of 1848 and 1849, in relation to the rights of women. The third section of the act of the year 1849 provides that "all contracts made between persons in contemplation of marriage shall remain in full force after such marriage takes place." This puts an end to the argument that the marriage union had any effect upon the contract, whatever it was. This statute, however, was but declarative of the law of equity as it existed before the statute, as we shall presently show. In respect to these rights, Catharine must be regarded as a *femme sole* at the time of making, and at the time of performance of the agreement between her and her husband. She went into the possession of the property under the agreement;

she paid of her own means a pecuniary consideration of $151; she paid the remainder of the value of the property from the proceeds of her labor, and she married him according to the terms of that agreement.   As between her and her husband (leaving out of view all creditors), what was to prevent her from obtaining in the courts specific performance of this agreement?

In *Mallins* v. *Brown* (4 Comst., 404), it was held, that A. having been drawn into a contract that he would not have made but for the agreement of B. to do an act on his part, which he refused afterwards to perform; and where the money paid by A. would not, if repaid, restore him to his former condition, the court held, that this would operate as a fraud upon A., unless the agreement was carried into execution, and on this ground they decreed specific performance. GARDNER, J., who delivered the opinion of the court, said: " The defendants insist upon the statute of frauds.   To permit them to avoid the agreement upon this ground would be to make the statute an instrument of fraud instead of a shield against it.   The money was paid by Mallins, and accepted by Monroe as a complete performance of the agreement on the part of the former."   The learned judge then refers to the proposition urged by the defendant, that the mere payment of money is not alone regarded as sufficient to take the case out of the statute, and he says this is not a settled question where the contract is for the sale of lands; but without determining that question, he says the case can be sustained on the ground of fraud of the party upon whose agreement the advantage has been obtained.   And TAYLOR, J., who gave an opinion in the same case, though he says that "the mere payment of money may not be sufficient," adds, "that it is universally agreed that the ground upon which a court of equity will regard such part performance of an agreement as creating an equity, is, that it would be a *fraud* upon the party if the transaction were not completed."   This had long been the settled doctrine in equity.   Payment alone, where such payment is obtained by representations or acts which amounted to a fraud upon the party from which payment is

obtained, and where the party cannot be restored to his or her former condition, is a sufficient ground in a court of equity to authorize the court to interfere and decree specific performance. STORY says: "Where one party has performed his part of the agreement, in the confidence that the other party would do the same, it is obvious that if the latter should refuse, it would be a fraud upon the former to suffer this refusal to work to his prejudice." (Eq. Jur., § 759.) It is not necessary to cite authority in a court of equity, that a party is estopped from setting up his own fraud or bad faith as a defense.

The case of *Lowry* v. *Tew* (3 Barb. Ch., 413), Chancellor WALWORTH laid down the broad doctrine on this point, which not only covers, but seems to have been so made for this case, that I cannot avoid transferring it to this opinion. He says: "The principle upon which courts of equity hold that a part performance of a parol agreement is sufficient to take a case out of the statute of frauds, is that a party who has permitted another to perform acts on the faith of an agreement, shall not be allowed to insist that the agreement is invalid because it is not in writing, and that he is entitled to treat those acts as if the agreement, in compliance with which they were performed, had not been made. In other words, upon the ground of fraud in refusing to execute the parol agreement after a part performance thereof by the other party, and where he cannot be placed in the same situation that he was before such part performance. Taking possession, in compliance with the provisions of such agreement, accompanied with other acts, which cannot be recalled so as to place the party taking possession in the same situation that he was before, has always been held to take such agreement out of the statute of frauds." There are no cases in conflict with these. They are too sound to be doubted. There being payment of the valuable consideration, and the taking possession, in this case, Catharine, as against her husband, was entitled to have the agreement performed. Nor did her subsequent marriage to him suspend, or make void this agreement. If it was ever the rule, that at law, intermarriage worked such an effect, it never was the rule in equity.

The case of *Miller* v. *Goodwin*, reported in 8 Gray, 542, is in point, and is in direct conflict with the views of the General Term in this case. It was there held that a contract made in contemplation of marriage, to be performed after marriage, may be enforced in equity. The consideration in that case was for past services as a servant girl, and in consideration that she would marry him, and they were afterwards married. The husband after marriage did convey the land to her, according to his agreement, and died. It being supposed that at common law the marriage extinguished the contract, and that the subsequent execution of it was void (as the Supreme Court supposed in this case), the widow filed her bill in equity against the heirs-at-law, that they be made specifically to perform by the execution of a good deed. The court said: "Such contracts, when made in contemplation of marriage, respecting the property of either of the parties (though released or extinguished at law by marriage), are held good in equity, and will be enforced by a court of chancery against the heirs of the party." And the court ordered the heirs, who claimed the property by inheritance, specifically to convey. The following authorities are cited to sustain this opinion. (*Haymer* v. *Haymer*, 2 Vent., 343; *Acton* v. *Acton*, Pre. in Ch., 237; 1 Sug. on Vend. (7 Amer. ed.), 286.) Story in his Eq. Jur., § 1320, says: "That a court of equity will, in such cases, carry into effect a contract made before marriage between husband and wife, although it would be avoided at law." An agreement, therefore, entered into between husband and wife, before marriage, for the mutual settlement of their estates, *or the estate of either of them upon the other*, upon the marriage, even without the intervention of trustees, will be enforced in equity, for equity will not suffer the intention of the parties to be defeated by the very act which is designed to give effect to such a contract." To the same effect is the case of *Fursor* v. *Penton*, 1 Verm., 408.

In the case of *Connel* v. *Buckle*, reported in 2 P. Wms., 242, 243, a *femme sole* designing to marry agreed with her intended husband that she, upon her marriage, would convey her lands to her husband and his heirs, and she gave him a bond in the

penalty of £200, conditioned to make such conveyance. After the death of the husband and wife, the heirs of the husband brought an action against the heirs of the wife to compel specific performance. The objection raised was, that by the intermarriage the contract between the parties became void, and that a personal action upon the bond was suspended; and being once suspended, a personal action became extinct. The Lord Chancellor said, "it is unreasonable that the intermarriage, upon which alone the bond is to take effect, should itself be the destruction of the bond," and he added, "the foundation of that notion is, that in law the husband and wife being one person, the husband cannot sue the wife on her agreement; whereas in equity, it is the constant experience that the husband may sue the wife, or the wife the husband, and the husband might sue the wife on this very agreement." The Supreme Court in this case, overlooking these more liberal rules of equity, seem to have followed in this case, brought in equity, the crude, harsh old rule of the common law. The modern advance, both in this country and in England, of a more reasonable, wise and just view of the separate and independent rights existing between husband and wife, both in legislation and in the courts, amounts to a repudiation of that despotic rule originating in the dark ages, that a wife, neither in her person or estate, had any legal existence. The unseen wisdom of these oracular utterances of black letter common law, I am happy to say, no longer obscures the jurisprudence of this State. We have broken loose from the superstition that all wisdom necessary to guide us in this enlightened age is to be sought in the annals of the past, and have ventured to legislate and to adjudge that as the circumstances demand changes suited to the condition of a free people, the spirit of their laws should be accommodated; and it is my view of our condition that we possess as much practical wisdom to determine the proper spirit of justice which befits the wants of the age, as existed even in the days of William the Conqueror.

In accordance with the provision of our own statute, it was held in this court, in *Power* v. *Lester* (23 N. Y., 530), that

our Code, section 114, had repealed the common law rule
that the unity of persons by marriage would suspend the
rights of husband and wife to sue each other during coverture,
and that the acts of 1848 and 1849 continued the separate
estate of the wife in herself, and that a wife may maintain
an action in her own name against her husband or any other
person. What then prevented Catharine Remerschnider,
after taking possession of the property so purchased, and pay-
ing her separate estate, sufficient to constitute a good and
valuable consideration, from having the agreement specifi-
cally performed by a court of equity? If she had not
married him there could be no doubt; and marriage, as we
have shown by the law, makes no difference. What she had
a right to, in equity, equity will regard as done. As between
her and her husband, it was the agreement. He has had the
advantage of it, and cannot restore her to hers. He is not
to be permitted in court to deny it. In addition to the other-
wise good consideration, she married him. He has no right
to complain of this. By it he has secured the payment of all
his debts. If the contract was valid without marriage, the
marriage did not destroy it. All that was wanting to con-
summate the agreement was the execution of · the deed.
Equity demanded it; justice demanded it; and the husband
at length reluctantly performed that act, which equity would
have enforced. No existing creditor complained. Her own
present means and her future earnings paid all those claims.
For a period of four or five years, as between Catharine and
her husband, and between her and all creditors of her hus-
band, this property was paid for. It was in equity as much
hers as if the title had been executed at the time it was agreed
to be; and when it was executed equity gives it relation back
to the time when it should have been done. It should have
been executed in 1854. In equity, it was then executed. In
1860, six years afterwards, George Remerschnider indorsed a
note. In 1861, he was sued upon it; by a judgment thereon,
this became a legal liability on him, and the plaintiff be-
came thereby the legal creditor of George; and the question
then is, has this judgment creditor, made such five years after

Catharine was the equitable owner of this estate, the better title to the property in question? The Supreme Court held that he had, because the agreement remained unexecuted until after the plaintiff became a creditor of her husband. This I regard as a grave error of the Supreme Court.

There is still another view of this case, in equity which gives the defendant Catharine Remerschnider the better right to this property over the plaintiff as a subsequent judgment creditor of George. I need not cite authority that a husband or other party who is solvent may make a voluntary transfer to, or settlement upon, his wife or child; and that such transfer or settlement is good against all the world, except existing creditors. Whatever may have been the qualified rule in England, and was substantially followed by Chancellor KENT, in *Reade* v. *Livingston* (3 Johns. Ch., 500), the uniform decisions of our courts since that day have been to sustain the proposition I have stated. The cases of *Hinde's Lessee* v. *Longworth* (11 Wheat., 199), *Jackson* v. *Seward*, in the Court of Errors (8 Cow., 406), *Carpenter* v. *Roe* (10 N. Y., 227), *Jackson* v. *Post* (15 Wend., 588), and *Babcock* v. *Eckler* (24 N. Y., 623), hold the rule that even a voluntary conveyance is only void as to antecedent, and not as to subsequent creditors; and *Reade* v. *Livingston*, so far as it is a variation of this rule, was overruled by the case of *Babcock* v. *Eckler* (*supra*). In *Babcock* v. *Eckler*, the Supreme Court had, as in this case, held that a conveyance to the wife from the husband for a mere equitable indebtedness was void against subsequent creditors. And DAVIES, J., in that case, says, " we think in this case a conveyance could be sustained, even though it was voluntary, and without any consideration, upon the authority of *Hinde's Lessee* v. *Longworth*, and *Carpenter* v. *Roe* (10 N. Y., 227). A majority of this court concurred in that holding. If this is the law, as I think it is, then every ground upon which the Supreme Court placed their decision is error; but an equitable indebtedness which existed in the case before us is one step farther in that direction than a mere voluntary conveyance, and a contract of purchase is still another support to the deed. But above all these common law decisions,

our statute (2 R. S., 127) declares that any conveyance or charge shall not be adjudged fraudulent as against creditors or purchasers solely, on the ground that it was not founded upon a valuable consideration." This statute seems to have been intended to declare the common law in our State as it then existed, and to settle the conflict between our common law and the decisions in the English courts, partially followed by our own. In this State, ever since the case of *Seward* v. *Jackson* (*supra*), the rule established there has been followed in all the courts, that a *subsequent* creditor must show *actual* fraud before he could set aside even a voluntary settlement. In the case before us, notwithstanding the undisputed fact found that there was no actual fraud, the deed, with a consideration actually paid, was set aside as fraudulent against a subsequent creditor; that though money was actually paid, the conveyance was still held to be voluntary, because the subsequent marriage of the parties, as well as the statute of frauds, made void the contract; that though it defrauded no existing creditor, though the husband was solvent as against subsequent creditors, the conveyance was still void as to subsequent creditors. It is a gross, legal misnomer to call a conveyance in which a pecuniary consideration passes from the grantee to the grantor voluntary. (8 Cow., 407.) This question has been so recently settled in this court that it seems to me to require no discussion. In *Babcock* v. *Eckler* (24 N. Y., 623), a husband who was indebted to his wife for property which belonged to her at law, for which equity would have regarded her as a creditor, transferred to her real and personal property. The court held a conveyance from husband to wife, though after marriage, not voluntary; and they further held that if the settlement upon the wife was a proper and reasonable one in the condition of the husband's estate at the time, it will not be invalidated by his subsequent creditors. Judge DAVIES, who delivered the leading opinion, adopted, with the approbation of the court, the rule laid down in the Court of Errors, in *Seward* v. *Jackson* (8 Cow., 407), " that to make a deed *voluntary*, it must be without the least valuable consideration." " That when a conveyance of

land is upon any the least valuable consideration, the question whether it be fraudulent as to creditors, belongs exclusively to the jury as a question of fact. Adopting these two propositions, or either one of them, we must either overrule *Babcock* v. *Eckler*, or reverse the judgment in this case.

Was there any legal fraud against anybody then? Suppose we call the money his, and Catharine his agent, and that he applied his own money, by her, to the payment of his own debts. Such payment, at all events, made him solvent, and put him then in a condition in which specifically to perform his agreement with her, to pay an honest debt he owed to her. In this solvent state they lived two, three, or four years. Would any court of equity, during that period, have refused to compel him specifically to perform his agreement with her? Did she not then become vested with rights against all the world?

The question then comes back: who has the better, or higher equities in the case, the wife as purchaser, or the plaintiff as a subsequent judgment creditor? The plaintiff charges that the deed was voluntary; that it was without consideration; that there was fraud in fact. Catharine Remerschnider, the defendant, controverts each of these charges, and the issue is thus made. The Special Term of the court, assuming the question to be one of equity only, and that the equities of the two parties (the plaintiff and Catharine) to be *bona fide* creditors of George Remerschnider; who then has the highest equity? It is an old equity maxim, "that between two equities he has the better title who is first in point of time." (Co. Litt., 14 *a.*) Her title is oldest.

In every view of this case, I am confirmed in my first judgment as to the equities, and am for reversing the judgment of the General Term, and for affirming that of the Special Term, with costs in this court and in the General Term.

Judgment of the General Term reversed, and that of the Special Term affirmed.