In the Matter of the Estate of WALTER H. D. KILLOUGH, Deceased.

Surrogate's Court, Kings County, June 13, 1933.

*Hunt, Hill & Betts* [*Walter A. Peterson* and *George Whitefield Betts* of counsel], for the temporary administrators and executors.

*Griffiths & Content*, for Mary E. Potter, as executrix.

*Barry, Wainwright, Thacher & Symmers* [*Herbert Barry* of counsel], for the American Humane Association.

*John Godfrey Saxe*, for Columbia University.

*James Marshall*, for Dr. Mary E. Potter.

WINGATE, S. The Supreme Court of Wisconsin has aptly said: " That field of law which goes by the name of the conflict of laws is one of the most thorny and difficult fields to traverse. It is full of conflicting decisions, refined reasoning, and unsatisfactory results." (*Northwestern Mut. L. Ins. Co.* v. *Adams*, 155 Wis. 335, 337.)

The truth of this statement was never better illustrated than in the facts of the case at bar, in which this court is faced by the unpleasant necessity of refusing to follow a decision either of the Appellate Division for the Second or of that for the Fourth Department, since these illustrious tribunals have reached diametrically opposing results on states of fact legally indistinguishable from those of the case at bar.

The decision in this department is *Clough* v. *Gardiner* (111 Misc. 244), written by Mr. Justice KAPPER, now a member of the Appellate Division, and unanimously affirmed (194 App. Div. 923) upon the opinion of the trial court. The diverse result was reached by the Fourth Department in *Domres* v. *Storms* (236 App. Div. 630) by a majority opinion, Mr. Justice EDGCOMB registering a vigorous dissent.

The issue at bar arises upon a motion to dismiss, with the result, under the practice prevailing in this State, that the facts must be viewed as upon a demurrer. (*Matter of Kirkman*, 143 Misc. 342, 343; *Matter of Duggan*, 146 id. 596, 597.) Thus viewed, the pertinent considerations upon which decision must be based are as follows: The present testator, Walter H. D. Killough, and the claimant, Dr. Mary E. Potter, were domiciled citizens of the State of New York possessing no property or status in the State of Vermont. On July 31, 1929, they were driving in decedent's automobile in the latter State. Dr. Potter was a passenger and Mr. Killough was driving. Through the gross negligence of the latter, the car was wrecked, he was killed, and Dr. Potter sustained physical injuries for which she has filed a claim against Mr. Killough's estate in the sum of $100,000.

At the time of the occurrence the statutes of Vermont provided: " The owner or operator of a motor vehicle shall not be liable in damages for injuries received by any occupant of the same occasioned by reason of the operation of said vehicle * * * causes such injuries are caused by the gross or willful negligence of the operator." (Vermont Laws of 1929, chap. 78.)

Sections 3310 and 3311 (Vermont Laws of 1917), so far as presently pertinent, read:

" Sec. 3310. Actions for bodily hurt surviving, when. If in an action for the recovery of damages for a bodily hurt or injury,

occasioned to the plaintiff by the act or default of the defendant or defendants, either party dies during the pendency of such action, the action shall survive and may be prosecuted to final judgment by or against the executors or administrators of such deceased party. * * *

" Sec. 3311. Survival of causes of action. The causes of action mentioned in the two preceding sections shall survive; and the actions may be commenced and prosecuted, or, when commenced in the lifetime of the deceased, may be prosecuted by or against the executor or administrator, where by law that mode of prosecution is authorized."

Although it is conceded that had the events hereinbefore recited occurred within the State of New York, the claimant would be without remedy, it will promote clarity in the consideration of the problem, if the basis and scope of the laws of this State in this regard be reviewed.

New York is a common-law State, article XXXV of the Constitution of 1777 continuing in force the portions of the law which were in existence on April 19, 1775. This constitutional enactment has been consistently maintained through the various subsequent constitutional revisions and is to be found in section 16 of article I of the present Constitution.

" At common law, originally, all actions arising *ex delicto* died with the person by whom or to whom the wrong was done. Thus, when the action was founded on any malfeasance, or misfeasance, was a tort, or arose *ex delicto*, such as trespass for taking goods, etc., trover, false imprisonment, assault and battery, slander, deceit, diverting a watercourse, obstructing lights, escape, and many other cases of the like kind, where the declaration imputes a tort done either to the person or property of another, and the plea must be ' not guilty,' the rule was ' *actio personalis moritur cum persona.*' " (*Hegerich* v. *Keddie*, 99 N. Y. 258, 259.)

The genesis of this rule of law is frequently attributed to a statute of Edward I. This conception, however, appears erroneous, since the only enactments during the reign of that monarch which even remotely relate to the question, are found in chapters XIX and XXIII of the statutes of 13 Edward I, enacted in 1285, the former reading: " Whereas after the Death of a person dying intestate, which is bounden to some other for Debt, the goods come to the Ordinary to be disposed; the Ordinary from henceforth shall be bound to answer the Debts as far forth as the Goods of the Dead will extend, in such sort as the Executors of the same Party should have been bounden, if he had made a testament," and the latter giving the right to sue on contracts.

Furthermore, from the days of Magna Charta, there is only one previous statute dealing with decedents' estates. This is chapter XVIII, 9 Henry III, enacted in 1225, which provides: " If any that holdeth of us Lay-fee do die, and our Sheriff or Bailiff do shew our Letters Patents of our Summon for Debt, which the dead man did owe to us; it shall be lawful to our Sheriff or Bailiff to attach and inroll all the goods and chattles of the dead, being found in the said fee, to the Value of the same Debt, by the sight and testimony of lawful men, so that nothing thereof shall be taken away until we be clearly paid off the debt; (2) and the residue shall remain to the Executors to perform the testament of the dead; (3) and if nothing be owing unto us, all chattels shall go to the use of the dead (saving to his wife and children their reasonable parts)."

It seems apparent, therefore, that the rule of law that a personal action dies with the person, is of extremely ancient origin, and was based on the conception that death terminated the rights and responsibilities of the individual for all purposes, leaving merely his temporal possessions for disposal without any legal continuation of his individuality in the person of the representatives selected by him, or by operation of law, for the disposal of the assets, the ownership of which the death had terminated. This conception inevitably produced the result that if the decedent had, in his lifetime, committed an injury to the person or property of another which was capable of compensation in *damages* alone, the action died with the person by whom the wrong had been committed. (1 Saund. 216-a, note (1) to *Wheatley* v. *Lane; Kirk* v. *Todd*, L. R. 21 Ch. Div. 484, 489; Williams Exrs. 1600.) Where, however, the estate of the tort feasor could be shown to have been increased by identifiable property as a result of his act, this could be recovered in specie by the injured party. (*Le Mason* v. *Dixon*, W. Jones 173, 174; *Hambly* v. *Trott*, Cowp. 371.) These authorities emphasize the common-law conception of the complete termination of the existence of the deceased for all purposes, any recovery permitted being substantially *in rem*, upon a theory which modern legal concepts would term a tracing of assets.

Such, then, was, and continued to be, the legal conception of the rights and liabilities of the estate of a decedent in respect to matters of tort, up to the time of the enactment of the Revised Statutes in 1828 — a period of well over six hundred years. The statute then enacted is contained in 2 Revised Statutes, part III, chapter VIII, title 3, article 1, and reads as follows:

" § 1. For wrongs done to the property, rights or interests of another for which an action might be maintained against the wrong-doer, such action may be brought by the person injured,

or after his death, by his executors or administrators, against such wrong-doer, and after his death against his executors or administrators, in the same manner and with the like effect in all respects, as actions founded upon contracts.

" § 2. But the preceding section shall not extend to actions for slander, for libel, or to actions of assault and battery, or false imprisonment, nor to actions on the case for injuries to the person of the plaintiff, or to the person of the testator or intestate of any executor or administrator."

The wording of the first section of this statute has been continued, unaltered, to the present day, and is now found in section 120 of the Decedent Estate Law. In the presently effective enactment, the second section has been consolidated with the first without alteration in effect, and now reads: " This section shall not extend to an action for personal injuries, as such action is defined in section thirty-seven-a of the general construction law; except that nothing herein contained shall affect the right of action now existing to recover damages for injuries resulting in death."

The portion of the General Construction Law to which reference is made reads:

" § 37-a. Personal injury. ' Personal injury ' includes libel, slander, criminal conversation, seduction and malicious prosecution; also an assault, battery, false imprisonment, or other actionable injury to the person either of the plaintiff, or of another."

The meaning of this enactment, which is clear on its face, is placed beyond the realm of controversy by its interpretation in *Hegerich* v. *Keddie* (99 N. Y. 258), in which (at p. 262) its effect is stated to be: " Actions by and against executors and administrators for wrongs done to the property rights, or interests of their intestate or testator are hereby authorized, but so far as such wrongs have heretofore been remediable by actions on the case for injuries to the person of the plaintiff, or to the person of the intestate or testator of any executor or administrator, they shall not survive the death of the person to whom the wrong is done."

Although the enactment of this portion of the Revised Statutes may, as indicated by the court (p. 261), have increased in some small measure the rights of recovery against personal representatives for torts against property committed by a decedent, it was, in the main, declaratory of the previously existing common law and pointedly excluded from change the long-standing rule that no action could be brought against an executor or administrator for purely personal injuries inflicted by acts of the deceased.

Chapter 450 of the Laws of 1847 is frequently erroneously pointed to as a further departure from the common-law rule. This enacted

that: " § 1. Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default, is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages, in respect thereof, then and in every such case, the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony."

The damages recovered in such an action were, by a subsequent section of the law, distributable solely to the widow and next of kin of the deceased in the proportions specified for the distribution of intestate assets. In reality this section, and its continuations to and into section 130 of the present Decedent Estate Law, did not modify the ancient common-law rule, but effected the creation of an entirely new cause of action not in the least contemplated by the common law. (*Phœnix Indemnity Co.* v. *Staten Island Rapid Transit R. Co.*, 251 N. Y. 127, 136; affd., 281 U. S. 98; *Werra* v. *Cassedy*, 229 App. Div. 590, 592.) Any personal right of recovery by the deceased injured party remained wholly nonexistent, as at common law. The statute merely recognized and effectuated a species of property right, hitherto unknown, in the productive power of a person dying as the result of a wrongful act, and, in effect, declared that the destruction of this right, possessed by the widow and natural distributees of the deceased, should result in their compensation.

As the Court of Appeals points out, in referring to this statute: " The cause of action here provided for has been held not to be a devolution, but a new one calling for the application of another rule of damage and distinguished by many other attributes." (*Hegerich* v. *Keddie*, 99 N. Y. 258, 267.)

The foregoing historical summary demonstrates that if the continuity of the common-law rules through the period of the revolutionary change be recognized , it is obvious that the established policy of the People of this State for the entire period of recorded legal history, from Magna Charta to date — over 700 years — has been opposed to the allowance of any action for a personal tort by an injured party against the personal representatives of a deceased tort feasor. Not only is this negatively demonstrated by the failure to alter the common-law rule in this regard, but it affirmatively appears from the express statutory exclusion of such a right in the enactment of the Revised Statutes which has continued through numerous re-enactments to the present day.

The diverse legal conceptions of the situation held in Vermont

and New York being demonstrated, there remains for determination the extent to which the courts of the latter sovereignty will or can effectuate the ideas of the former. This is the question of conflict of laws here involved.

An obviously unfortunate characteristic of many expressions of opinion on the subject of conflicting legal policies of different sovereignties, is that they appear to lose sight of the fact that, in last analysis, a problem involving diverse laws, or, to use the accepted phrase, a conflict of laws, presents merely the usual elements of rights, jurisdiction and remedies inherent in any ordinary legal controversy. The decisions most frequently encountered depart entirely from the customary orderly analysis of these elemental considerations, and plunge into discussions of abstruse and imponderable matters such as comity, which is a question for the legislative or executive branches of the government to the exclusion of the judicial. As is said by Professor Beale, that greatest of modern authorities on the subject of conflict of laws, " the *courts* do not exercise comity, and are as much bound by the rule adopted by the legislative power as by any other portion of the law." (Beale Confl. Laws, § 71, p. 102; see, also, *Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 110.) The function of the courts is to apply and effectuate existing laws, not to make new ones; to interpret and enforce governmental policies, not to create them. (Beale Confl. Laws, § 71; Story Confl. Laws, § 38; *Bank of Augusta* v. *Earle*, 13 Pet. 519, 589; *Cross* v. *U. S. Trust Co.*, 131 N. Y. 330, 340.)

In determining whether any given action is maintainable, a court, consciously or otherwise, should, and usually does, assay the presence or absence of five essential factors:

*First.* Whether there has been an act or neglect of "A;"

*Second.* Whether this act or neglect of "A" has caused an injury to " B;"

*Third.* Whether "A" owed " B " a legal duty to abstain from the particular act or neglect in question, which is merely another way of saying whether "A's " action or omission has given rise to a legal right of recompense to " B; "

*Fourth.* Whether a remedy is available to " B " for the enforcement of this right;

*Fifth.* Whether the court whose aid has been invoked has jurisdiction over the parties.

Unless all five of these basic questions can be answered in the affirmative, no recovery is possible, and in this connection, it is quite immaterial whether the act or neglect on the one hand, and the seeking of the remedy on the other, concern the laws of the same or of different sovereignties.

Approaching the consideration of the creation of a cause of action in the first instance, which is the essential to any recovery, numbered " third," *supra*, Story lays down as " the first and most general maxim " relating to the general subject, that " every nation possesses an exclusive sovereignty and jurisdiction within its own territory. The direct consequence of this rule is, that the laws of every State affect, and bind directly all property, whether real or personal, within its territory; and all persons who are resident within it, whether natural born subjects, or aliens; and also all contracts made and acts done within it." (Story Confl. Laws [6th ed.], § 18.) This conception is adopted by Justice WOODRUFF in the Superior Court opinion in *Whitford* v. *Panama R. R. Co.* (3 Bosw. 67, 83) and is expressly approved in Judge DAVIES' opinion in the Court of Appeals (*Whitford* v. *Panama R. R. Co.*, 23 N. Y. 465, 481, 482, although incorrectly referred to as reported in " 3 Duer ").

It follows, therefore, that the law of the sovereignty within which any act is performed must, in the first instance, determine its nature and quality, whether it is to be considered innocent or tortious, and the rights, if any, to which it gives rise. (*Slater* v. *Mex. Nat. R. R. Co.*, 194 U. S. 120, 126; *Pullman's Palace-Car Co.* v. *Penna*, 141 id. 18, 22; *Hervey* v. *R. I. Locomotive Works*, 93 id. 664, 671; *Sneed.* v. *Ewing*, 5 J. J. Marsh. [Ky.] 460, 472; *Whitford* v. *Panama R. R. Co., supra.*)

In deciding whether a recovery can be had as a result of an act or neglect of "A" which has caused an injury to " B," it is, therefore, necessary to ascertain first, the locality in which the act or neglect occurred, and then to be informed as to whether or not the laws of the particular sovereign within whose domain the event took place attached any legal consequences to it.

In the case at bar the facts admitted for the purposes of this motion will, for the present, be presumed to establish this latter point in the affirmative, as a result of which it follows that were Mr. Killough and Dr. Potter both alive, the latter could, in Vermont, recover recompense from the former for such damage as she might be able to demonstrate she had sustained. The next matter for determination is that numbered " fourth " in the foregoing enumeration, and concerns the availability of a remedy for the wrong thus established. A consideration of this matter in the case at bar assumes a dual aspect in view of the death of Mr. Killough.

The question of whether, were they both living, Dr. Potter might recover in New York, is not presented by the facts of the case, as Mr. Killough died in the disaster. Since, however, the argument of the litigants indicates that some mental confusion

exists in their attempt to distinguish this question from the one which is really at issue, certain observations regarding it may not be amiss. In such a connection, it would be of some importance to determine whether or not the act of Mr. Killough was a tort at common law, or whether the liability which Vermont laws imposed upon him resulted merely from a local statutory enactment giving rise to a new cause of action theretofore unknown. On the former alternative, it would be obvious that the courts of any common-law State would enforce the liability, provided jurisdiction could be obtained over both parties. This follows from the basic principle that a person suffering a common-law tort carries the cause of action about with his person and can sue the tort feasor wherever the latter can be found (*Beach* v. *Bay State Steamboat Co.*, 30 Barb. 433, 435; *Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 110; *Stewart* v. *B. & O. R. R.*, 168 U. S. 445, 448), which in turn is based upon the fact that by reason of its common-law origin, the legal conceptions of both States are, or will be assumed to be, identical. (*Matter of Smith*, 136 Misc. 863, 878; *Matter of Klyszewski*, 140 id. 241, 244; *Matter of Marsland*, 142 id. 230, 232; *Matter of Dumarest*, 146 id. 442, 443.) If, however, the act committed in Vermont became tortious merely by reason of a local statutory enactment, an additional element would be injected into the problem in the question of whether or not the foreign sovereignty whose courts are invoked for the purpose of enforcing a remedy for the act which Vermont has designated as wrongful, will aid the plaintiff in the vindication of the right thus created by the alien statute. This is the question which was presented in *Loucks* v. *Standard Oil Co.* (224 N. Y. 99), and which the Court of Appeals, on the facts therein demonstrated, decided in the affirmative.

Obviously a statutory enactment of one State can, *proprio vigore*, have no effect within the territorial limits of another, since such a result would amount to a *pro tanto* displacement of the sovereignty of the latter. " The passage of laws is the highest act of sovereignty. Each independent nation or country has the same right to pass laws. It necessarily follows that the laws of a state or country ' can have no intrinsic force * * * except within the territorial limits and jurisdiction of that country (Story's Confl. Laws, §§ 7, 8)." (*Beach* v. *Bay State Steamboat Company*, 30 Barb. 433, 434; see, also, Beale Confl. Laws, § 105, p. 118; *Whitford* v. *Panama R. R. Co.*, 23 N. Y. 465, 470, 481; *Hope* v. *Brewer*, 136 id. 126, 137; *Loucks* v. *Standard Oil Co.*, 224 id. 99, 110.)

Assuming, but not deciding, that the act of Mr. Killough, which this Vermont statute determined to be a tort in that State, would not, if performed in New York, have received a like designation

here, an interesting question would be presented under the decision in *Jacobus* v. *Colgate* (217 N. Y. 235), whether New York courts would have enforced any liability against Mr. Killough had he survived and been amenable to their process. The language of Judge CARDOZO at pages 241–242 of this case, at least raises an arguable issue on the subject. The question presented in the *Jacobus* case was the propriety of enforcement of a Kansas liability for wanton destruction of property under a subsequent amendment of the New York Code making such an act actionable. The opinion reads in part, beginning at page 240: " We need not dwell upon the question whether before this amendment of the Code, a trespass on foreign lands was recognized by our law for any purpose as constituting a wrong * * *. If we recognized it as a wrong, we gave no redress for it. If the injured owner had suffered an impairment of his right, he had none the less no right of action. He may have had one under the laws of some other state or country. He had none under our laws. His cause of action till then was local, and limited by the boundaries of the state where the wrong was done. It has now become transitory, giving rise to ' an *obligatio*, which like other obligations follows the person, and may be enforced wherever the person may be found' (*Slater* v. *Mex. Nat. R. R. Co.*, 194 U. S. 120, 126). When the cause of action was local, it was not in this jurisdiction a cause of action at all. It became a cause of action by force of the statute which made it transitory." The decision of the court was that no recovery could be had. (See, also, *Leonard* v. *Col. Steam Nav. Co.*, 84 N. Y. 48, 53; *Stewart* v. *B. & O. R. R. Co.*, 168 U. S. 445, 448.)

It is obvious from this authoritative determination of the Court of Appeals that the assertion that a particular cause of action is transitory constitutes merely a begging of the entire question respecting its enforcibility in a jurisdiction other than that in which the act itself took place. To say that it is transitory is merely another mode of expressing the thought that the laws of the forum will enforce it, which, in a case like the present, is the gist of the issue presented. It is not transitory if it is not thus enforcible and this depends not in the least upon the local consequences attached to it by the laws of the jurisdiction where the act took place but to the remedies, if any, made available in respect to it in the locality where the suit is brought. Unless or until such a remedy is granted by the law of the forum, the person to whom, according to the foreign statute, an injury has been done, had, at most " a moral right to redress, but he had no legal right to redress except in the State where the wrong was done." (*Jacobus* v. *Colgate*, 217 N. Y. 235, 243.)

The question of whether or not a remedy is granted for the relief of the particular injury is uniformly held to be determinable solely by the law of the forum. (*Ruggles* v. *Keeler*, 3 Johns. 263, 268; *Merchants' L. & T. Co.* v. *Clair*, 36 Hun, 363, 364; affd., 107 N. Y. 663; *Petersen* v. *Chemical Bank*, 32 id. 21, 42; *Miller* v. *Brenham*, 68 id. 83, 87; *Wooden* v. *West. N. Y. & Pa. Ry. Co.*, 126 id. 10, 16, 17; *Jacobus* v. *Colgate*, 217 id. 235, 240, 241; *Baltimore & Ohio Ry. Co.* v. *Joy*, 173 U. S. 226; *Munos* v. *Southern Pac. Co.*, 51 Fed. 188, 190; *Martin* v. *Wabash R. R. Co.*, 142 id. 650, 651; *Portland Gold Mining Co.* v. *Stratton's Independence*, 196 id. 714, 716; *Luster* v. *Martin*, 58 F. [2d] 537, 539; *Orr* v. *Ahern*, 107 Conn. 174, 177; *Gordon* v. *Chicago, R. I. & Pac. Ry. Co.*, 154 Iowa, 449, 451; *Austin's Admr.* v. *Pittsburgh, C., C. & St. L. R. R. Co.*, 122 Ky. 307; *Richardson* v. *N. Y. Cent. R. R. Co.*, 98 Mass. 85, 92; *Vawter* v. *Mo. Pac. Ry. Co.*, 84 Mo. 679, 687; *Woodard* v. *Mich. S. & N. I. R. R. Co.*, 10 Ohio St. 121.)

In any event, for the New York courts to enforce a liability even against Mr. Killough if living, it would be necessary to determine that the foreign statutory liability was not contrary to the public policy of New York laws. (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 106.)

The remaining and chief question for determination arises by reason of Mr. Killough's death. This involves considerations both of remedy and of the jurisdiction of New York courts.

Assuming the Vermont cause of action against Mr. Killough, personally, to have been one which New York laws would have enforced, it is, of course, well established that an action could have been maintained against him, here, in his lifetime, only on the condition that *jurisdiction had been obtained over him* by the courts of New York (*Loucks* v. *Standard Oil Co.*, 224 N. Y. 99, 110; *Beach* v. *Bay State Steamboat Co.*, 30 Barb. 433, 435; *Stewart* v. *B. & O. R. R. Co.*, 168 U. S. 445, 448), since jurisdiction is fundamentally a *sine qua non* to any recovery. This difficulty lies at the root of the present claimant's case. That neither this nor any other mundane court can obtain jurisdiction over him now, is obvious, since he is dead. To obviate this fundamental defect, the claimant seeks to substitute his executors or estate as defendants in his stead. If, however, a cause of action cognizable by New York law was created in the first instance, the manner of its enforcement is, as noted above, a question of remedy, which the entirely unanimous authority of all determinations with which the court is familiar (a few of which have been hereinbefore cited) holds must be decided in accordance with the law of the forum whose process has been invoked.

The essential question, therefore, is whether the laws of New York furnish a remedy for the relief of the injury to the claimant, or whether, in this State, her grievance while giving her here " a moral right to redress " was one for which she " had no legal right to redress except in the state where the wrong was done." (*Jacobus* v. *Colgate*, 217 N. Y. 235, 243.)

While the recognition of the existence of a right and the unavailability of a remedy may be a concept which some minds grasp with difficulty, it is uniformly recognized in the decided cases, and the differentiation is clearly pointed out in *Jacobus* v. *Colgate* (*supra*).

The most common instance of such a situation is one in which a defect in jurisdiction is found to exist. In such a case it frequently occurs that the suitor may have a valid claim, but relief is impossible by reason of his failure properly to bring the defendant before the bar of justice, either because of the absence of the latter from the territorial jurisdiction of the court or for some other reason. The facts of *Jacobus* v. *Colgate* itself furnish another instance of such a situation. It is also present where statutes of limitation inhibit the maintenance of an action in the forum invoked (*Miller* v. *Brenham*, 68 N. Y. 83, 87) and in many other instances.

Whatever the cause of the absence of a remedy available to the suitor, it is well established that the law of the forum alone must decide this question. (See authorities hereinbefore cited.)

The sole question for determination in the present case, therefore, resolves itself into one of the power of the New York courts to supply a remedy which the laws of the State do not recognize, and in effect to say that because "A" has committed a wrong but cannot be subjected to the jurisdiction of the court because no longer in existence, " C," who did not do the wrong and was never, legally speaking, within the jurisdiction of the State by which the existence of the wrong was determined, can be held liable for it. Such a substitution of defendants is apparently permitted by the laws of Vermont where such an action is brought in that State. It is not recognized in New York as has been demonstrated earlier in this review. (See, also, *Timian* v. *Whelan*, 128 Misc. 192, 194; affd., 219 App. Div. 859; *Mayer* v. *Ertheiler*, 144 id. 158, 159; *Harkins* v. *Provenzo*, 116 Misc. 61, 65.) The cause of action which Vermont grants against an executor or administrator of a wrongdoer is, of course, a new cause of action, unknown to the common law. That it can have no extraterritorial effect is obvious on the principles already discussed. The claimant contends that nevertheless this remedy, created in Vermont, which imposes a liability upon persons and property not now and never previously

within its jurisdiction, should be applied in this State. In a case like the present, the application of this principle would amount to a variation of our rules of decedent devolution by the dictate of a foreign State.

It is primary that the right to take property by devise or descent is a creature of positive law and not a natural right. (*Sultan of Turkey* v. *Tiryakian*, 162 App. Div. 613, 615; affd., 213 N. Y. 429; *Knowlton* v. *Moore*, 178 U. S. 41, 55; *State ex rel. McClintock* v. *Guinotte*, 275 Mo. 298, 312–314.) " At common law there was no right of succession in property. When a person died his property reverted to his sovereign. Except for statutory enactments of the various States permitting the disposition of property by will or in case of intestacy that the property of a deceased person shall pass to the persons named in the statute, the property of a person dying would revert to the State in which he resided." (*Matter of Barbour*, 185 App. Div. 445, 457; affd., 226 N. Y. 639.) It follows that the manner and terms of devolution are within the sole and absolute regulation of the sovereignty within whose jurisdiction the real or personal property involved is located. (*United States* v. *Perkins*, 163 U. S. 625, 629; *Mager* v. *Grima*, 8 How. [U. S.] 490, 493; *State ex rel. McClintock* v. *Guinotte*, 275 Mo. 298, 314.) Being purely the creature of the statutes, and solely within the legislative control of such State (*United States* v. *Perkins*, 163 U. S. 625, 627), its laws may place such conditions or limitations thereon as its policy may dictate, or may even abolish entirely any right of succession whatsoever. (*United States* v. *Perkins*, 163 U. S. 625, 629; *Mager* v. *Grima*, 8 How. 490, 493; *State ex rel. McClintock* v. *Guinotte*, 275 Mo. 298, 311–314.) As is said in the last-cited case (at p. 314): " this right of the State to foreclose absolutely, or partially, the right to inherit, by law or will, is * * * the exercise of that other power of the State which is inherent in its sovereignty, which allows the State or the Nation, to say what shall be done with the property owned by the citizen, at the time of his death." As a result of this principle, it is universally held that except as to real or tangible personal property having a *situs* elsewhere, the rights of any person to the effects of one deceased are to be determined solely by the laws of his domicile. (*Moultrie* v. *Hunt*, 23 N. Y. 394, 396, 403; *Peterson* v. *Chemical Bank*, 32 id. 21, 24, 43; *Graham* v. *First Nat. Bank of Norfolk*, 84 id. 393, 399; *Cross* v. *U. S. Trust Co.*, 131 id. 330, 339, 340; *Matter of Sherman*, 153 id. 1, 3; *Sultan of Turkey* v. *Tiryakian*, 162 App. Div. 613, 615; affd., 213 N. Y. 429; *Ennis* v. *Smith*, 14 How. [U. S.] 400, 424; *Whitten* v. *Bennett*, 77 Fed. 271, 273; *Sneed* v. *Ewing*, 5 J. J. Marsh. [Ky.] 460, 476.) As the Court of Appeals says in *Moultrie* v. *Hunt* (*supra*, at p. 403):

" Nothing is more clear than that it is the law of the country where the deceased was domiciled at the time of his death, which is to regulate the succession to his personalty in the case of intestacy."

Law like nature abhors a vacuum. For this reason it is the prevalent conception that the rights of those succeeding to property upon a death attach immediately, with no intervening hiatus of ownership. (*Read* v. *Williams*, 125 N. Y. 560, 570; *Barber* v. *Terry*, 173 App. Div. 469, 471.) If the sovereign exercised to the full its prerogative of escheat on death, none would have the temerity to assert that a foreign power could circumscribe its right. The effects of the Statutes of Wills and of Descent are in substance the same. Instead of taking to itself the property of the deceased, the sovereign directs its distribution among persons ascertainable in accordance with its laws. These persons are, by these laws, vested with the ownership of the property from the moment of the death, and their proprietorship is no more subject to diminution by an alien authority than if title had been assumed by the sovereign itself.

The law of the State of New York gives this right of succession subject to the solution of obligations which constitute valid and enforcible debts. " Debts " are defined as including " Every claim and demand, upon which a judgment for a sum of money, or directing the payment of money, could be recovered in an action." (Surr. Ct. Act, § 314, subd. 3.) By the provisions of section 120 of the Decedent Estate Law, however, it is expressly provided that no action may be brought for personal injuries caused by a decedent. It follows, therefore, that any such claim is not one of the obligations, the solution of which is made a condition precedent to the vesting of absolute title of a decedent's effects in the successors nominated by the sovereign.

Were New York State to pass a law subsequent to the death of the decedent impairing to the extent of such a claim the vested rights of such a distributee, it would appear clearly unconstitutional as a taking of property without due process of law. (*Jacobus* v. *Colgate*, 217 N. Y. 235, 240.) Perhaps the act of similar application of an alien statute having no binding force upon the property passing, might escape the letter of like criticism, but it would seem to be clearly within its spirit.

The appointment of an executor or administrator does not effect the continuance of the personality of the decedent. Such officer is merely the instrumentality established by the domicile of the decedent for performing the acts, largely ministerial, necessary for the transfer of the effects left by the deceased to those who, according to the dictates of its laws, succeed to their owner-

ship. They " are the representatives of the temporal property, that is of the debts and goods of the deceased, but not of their wrongs, except where those wrongs operate to the temporary [*sic temporal?*] injury of their personal estate." (*Whitford* v. *Panama R. R. Co.*, 23 N. Y. 465, 476.)

The common law and the statutes of New York prescribe the duties of an executor appointed pursuant to their provisions and it is utterly beyond the power of the Legislature of another State to add to or subtract from them. Indeed, it is absurd to suppose that such a regulation is intended by any foreign statute. (*Taylor* v. *Pennsylvania Co.*, 78 Ky. 348, 351.) Such would be the effect of the Vermont statute by a declaration that the claim for personal injuries caused by the decedent, which it has created, is a debt payable by and collectible from the New York executor.

It is primary that at common law and in the absence of enabling statutes, one sovereignty will not in any way recognize the existence of a personal representative appointed by another. He can neither sue nor be sued in the courts of any jurisdiction other than that of his appointment. (*Hopper* v. *Hopper*, 125 N. Y. 400, 403; *Morrell* v. *Dickey*, 1 Johns. Ch. 153, 156; *Helme* v. *Buckelew*, 229 N. Y. 363, 367.) If a sovereignty other than that of his appointment found him within its territorial limits it " might render a judgment that would be effective in the disposition of local assets." It could not render a judgment generally, *in personam*, which the courts of the domicile " would be under a duty to respect." (*Helme* v. *Buckelew*, 229 N. Y. 363, 366.) (See, also, *Johnson* v. *Powers*, 139 U. S. 156, 159.) It would indeed be a striking anomaly were it to be held that this Vermont statute could in this case have an effect in the State of New York which it would not possess in the jurisdiction of its enactment. That no such extraordinary result should be attained would seem to be demonstrated by the reasoning and results of such cases as *Richardson* v. *N. Y. Central R. R. Co.* (98 Mass. 85, 92); *Whitten* v. *Bennett* (77 Fed. 271, 273) and *Woodard* v. *Mich. S. & N. I. R. R. Co.* (10 Ohio St. 121).

One further consideration, in reality complementary to those heretofore considered, concerns the question of the limitation on bringing action. All decisions are in accord to the effect that although a cause of action has been created in one State, yet it is incapable of enforcement in another if not brought within the time limited for the institution of such actions in the latter. (*Miller* v. *Brenham*, 68 N. Y. 83, 87; *Ruggles* v. *Keeler*, 3 Johns. 263, 268; *Mines* v. *Southern Pacific Co.*, 51 Fed. 188, 190.) Applying this principle to the facts of the present case, Mr. Killough's act, under the laws of Vermont, gave a right of action for personal injuries;

section 120 of the Decedent Estate Law of the State of New York plus the common law, given statutory force by constitutional enactment, provides that such action, to be entertained in this State, must be instituted prior to the death of the tort feasor. This action was not brought within the time limited and, therefore, cannot be maintained.

The court has purposely refrained from any discussion of the violation of the public policy of this State which would be entailed in the enforcement of this claim in the courts of New York, since little or nothing could be added to the learned and lucid discussion of this subject by Mr. Justice KAPPER in *Clough* v. *Gardiner* (111 Misc. 244; affd., 194 App. Div. 923).

As noted in many authorities, the public policy of a State is to be found in its Constitution, statutes and judicial records. (*People* v. *Hawkins*, 157 N. Y. 1, 12; *Straus & Co.* v. *Canadian Pac. Ry. Co.*, 254 id. 407, 413.) The Constitution of the State of New York expressly continues the common law which uniformly determined that "*actio personalis moritur cum persona;*" the judicial records of this State demonstrate a uniform application of this principle; and finally, section 120 of the Decedent Estate Law, which is the sole pertinent statutory enactment, as authoritatively construed, expressly excludes from its broadening effect any possibility of the maintenance of such an action against a personal representative. It would be difficult to imagine how the public policy of this State against such a recovery could be more effectively demonstrated.

Thus far, the court has discussed the effect of the Vermont statute (Laws of 1917, § 3311) as capable of a construction granting such a cause of action against a New York personal representative. This point is, however, not free from doubt, and were it necessary to the result, the court would be inclined to construe it as giving no such right, since, being derogatory of the common law, a strict construction should be adopted. (*Matter of Smith*, 136 Misc. 863, 880; *Matter of Marsh*, 143 id. 609, 614; *Matter of Cantcr*, 146 id. 123, 126, 127, and authorities cited in these cases.) The statute reads that "the actions may be commenced and prosecuted * * * against the executor or administrator, *where by law that mode of prosecution is authorized.*" (Italics not in original.) Since such mode of prosecution is admittedly authorized in the State of Vermont, it is difficult to place any intelligible meaning upon the italicized words except that they are intended to limit the authority to prosecute such an action outside that State, to those localities in which the common-law rule has been abolished and by whose laws a prosecution for an action for personal injuries inflicted by a

decedent " is authorized " against his personal representatives. Such a construction would be logical and would acquit the Vermont Legislature of any intention to exceed its sovereign powers in the manner which the claimant contends it did.

The claimant and the Appellate Division for the Fourth Department have cited certain authorities for a diverse result which, in the opinion of the court, are not pertinent precedents in the decision of the question and these will be briefly reviewed.

In *Young* v. *Masci*, decided by the United States Supreme Court on April 24, 1933 (53 Sup. Ct. 599), the New York statute in question effected merely a modern application of the age-old tort principle that one who sets a dangerous instrumentality in motion will be held liable for resulting damages. This principle is one of universal recognition in every common-law State and, as pointed out at pages 601 and 602 of Mr. Justice BRANDEIS' opinion, the same result attained by the New York statute has been reached in many other jurisdictions by the application of ordinary common-law principles. Since, therefore, New Jersey obtained jurisdiction over all necessary parties, recognized the basic principle of liability, and its laws furnished remedies available in such a situation, its enforcement of liability was obviously consonant with the principles hereinbefore discussed.

*Leonard* v. *Columbia Steam Navigation Co.* (84 N. Y. 48) is cited by the Fourth Department as an authority for the proposition that " a transitory action * * * may be brought anywhere." In such bald form, this is not and never was the law. The correct statement of the underlying principle is that given in *Loucks* v. *Standard Oil Co.* (224 N. Y. 99, at p. 110) and innumerable other cases, that a cause of action " if transitory ' follows the person and may be enforced *wherever the person may be found.*' " (Italics not in original.) This, however, is merely a begging of the issue not only of this case but also of that of *Domres* v. *Storms*. This issue is whether, when the person cannot be found, another may be substituted in his place.

The quotation in the *Domres* case from *Slater* v. *Mexican Nat. R. R. Co.* represents unquestionably sound law, but has no application whatsoever to a situation like the present. In this case as well as in *Fitzpatrick* v. *International R. Co.* (252 N. Y. 127) and *Loucks* v. *Standard Oil Co.* (224 id. 99), which are also cited, plaintiffs' intestates had been killed by defendants' wrongful acts and recovery therefor was sought. In each case an action was granted to plaintiff for such a wrong both under the law of the place where the injury occurred and under the law of the forum where relief was sought. In each jurisdiction of all necessary

parties was obtained by the forum invoked. In the *Slater* case relief was denied; in the two New York cases it was allowed. In each case all of the necessary elements heretofore noted were present, namely, a wrong *by the defendant* created by the *lex loci delicti;* a recognition by the *lex fori* that such act constituted a wrong by the defendant; a remedy for the wrong, created by the latter and jurisdiction of the wrongdoer and the plaintiff. In the case at bar the last three are wholly absent. Dicta wrested from cases so dissimilar to the present have no persuasive force to a determination. Nor has the discrediting of the doctrine of " similar statutes " any bearing on the problem. The · whole underlying principle of the doctrine of the *Loucks* case is that if the jurisdiction where the act was done and that in which the remedy is sought *both* recognize that a cause of action exists at the time the action is brought, relief ·will be granted irrespective of differences in the form or quantum of the relief which their respective statutes afford. Such a decision is, however, far from holding that if a foreign sovereign recognizes it, and the laws of this State expressly exclude it, that the foreign law is to be preferred over our own.

The quotation from the final draft of the proposed Restatement of the Law of Conflict of Laws is, on its face, plainly inapplicable to the question at bar. Its statement reads: " Denial of enforcement of the foreign claim will *result in an undeserved benefit to the defendant.*" (Italics not in original.) This is clearly directed to the question of a property tort on the early common-law principles heretofore discussed. Where the tort would result in a " benefit to the defendant " whether " undeserved " or otherwise, the New York statute grants relief. It is merely in those cases not involving such considerations that our settled policy has set its face steadfastly against any recovery.

It is entirely true that in *Orr* v. *Ahern* (107 Conn. 174) the Connecticut courts applied New York laws instead of their own, but it was for the reason that under New York law no cause of action existed. That being the *lex loci delicti*, it is obvious that the essential prerequisite to a recovery hereinbefore numbered " third," was wholly absent, and the courts of Connecticut had no existing wrong to right or upon which to operate.

The contention of the claimant that a failure of our courts to enforce this foreign statute would be an infringement of constitutional guaranties, is wholly without merit. (*Carey* v. *Schmeltz*, 221 Mo. 132, 136; *Dougherty* v. *American McKenna Process Co.*, 255 Ill. 369, 371; *Kenney* v. *Loyal Order of Moose*, 285 id. 188, 190; *Chambers* v. *Baltimore & Ohio R. R. Co.*, 207 U. S. 142, 148.) In fact, as has been hereinbefore noted, a contrary course might well

be held to infringe the constitutional guaranties respecting the vested rights of those who became entitled to Mr. Killough's property on his death.

On the views hereinbefore expressed, the courts of New Jersey would, equally with those of New York, be powerless to grant a recovery to the claimant on the basis of some small items of personal property of the estate having a temporary situs in that State. That the views of the New Jersey courts coincide with those of this court in this regard is indicated by the decision of its chancellor made in an application by the present claimant in respect to this identical claim. His opinion is reported in *Potter* v. *First National Bank* (107 N. J. Eq. 72). The act of the other executors in reducing these New Jersey assets to possession was properly performed in the orderly administration of this estate. An order by this court to return them to that jurisdiction would be merely the direction of a futile act, and even if otherwise, would, in effect, amount to complicity by this court in the evasion of New York laws and the defeat of its clearly defined policy.

The motion to dismiss the claim must, therefore, be granted. Proceed accordingly.