## LEAYCRAFT *vs.* SIMMONS.

*In the Matter of Proving the Last Will and Testament of*
RICHARD LEAYCRAFT, *deceased.*

A testamentary declaration may be proved, although the *testatum* clause does not recite one to have been made. The statute does not require an attestation clause, and the only question on the probate, as to the form of execution, is, whether in fact all the proper ceremonies were performed.

It is sufficient that the testamentary declaration be made at the time, or on the occasion of signing the will, and as part of the ceremony. It is good, though made just before the testator subscribed.

Where the decedent was 89 years old, and though of undoubted capacity, made a will at his son's residence, the instrument was in the handwriting of the son, and was executed without the knowledge of his daughter, his only other child—*Held*, that the son having acted as his agent, and taking the largest share of the estate under the will, it was proper to call for further proof of a recognition of the will by the decedent; and such proof having been afforded, the will was pronounced for.

The testator having desired to make a codicil to his will, in order to enlarge the provisions in favor of his daughter, and his son, who took the chief share under the will, and who had the custody of that instrument, having refused to produce the will at the request of the testator, for the purpose of alteration—*Held*, that the will was not thereby rendered invalid.

The prevention of the execution of a codicil by improper means cannot operate to invalidate the will. A will can be revoked only in the manner and form prescribed by the Revised Statutes.

E. S. STOUGHTON, *for The Heirs.*

C. R. DISSOSSWAY, *for Executor.*

The civil law has nothing to do with the determination of this case : that law has never been adopted in this or any other *free country.*

By the civil law a testator could revoke his will without writing in the presence of three witnesses, together with the lapse of ten years after the testament. (2*d Domat civil law*, *page* 32⁻.)

No one will pretend that this is law with us. He might so contend, if it be admitted that *any* part of the civil law is binding on our courts.

There is not in this case the shadow of a shade of testimony that William Leaycraft used the least influence over the testator; had there been any such evidence, doubtless the other side would have produced it ; and there is evidence that the testator said " he had made the will himself."

The declarations of the testator, *made four months after the will was executed*, that he wanted to alter the will, should not have been given in evidence ; it makes not the slightest difference whether such declarations related to *revoking* the will or *altering* it, for the statute says, " no will in writing shall be revoked or *altered*, except" &c., and I cannot comprehend why parol evidence should be admitted, to show by the declarations of the testator that he meant to *alter* his will, and the same sort of evidence to show he wanted to revoke his will should be excluded ; such evidence in both instances is in the very teeth of the statute. (*Jackson* vs. *Kniffen*, 20 *John. Rep.*, 31. *Smith* vs. *Fenner*, 1 *Gallison Rep.*, 170).

The Surrogate has a perfect right, in deciding this case, to reject any testimony that on reflection he may consider improperly admitted: and if these declarations are *excluded*, the contestants wholly fail.

There is no evidence here that William Leaycraft stood towards the testator in such a relation that more than the usual evidence in support of the instrument should have been introduced : he was neither his attorney, priest, or physician, &c. &c. : and even were it proved that such relationship did exist, there is abundant evidence that the paper propounded expressed the true will of the deceased. This appears clear as day from the conversations he had with Darlington, Meeks, and others—and this is all that is required in the peculiar cases above referred to : it is manifest from the testimony, that the will of November, '51, was like the two previous wills, which the testator declared he had made himself, after deliberation. The truth, doubtless, is, that although said paper

of November, '51, is in the handwriting of William Leay-craft, it is substantially the same as the old wills.

The declarations of William, after the death of the testa-tor, were improperly admitted, or if admitted, amount to nothing : they were uttered in the heat and excitement of a family squabble ; as to William's saying what *he could have done*, it is a mere *brutum fulmen ;* and as to his saying he made or drew the will, it is the same as a lawyer's saying "I drew such a will," meaning he drew under the orders of the testa-tor : besides, we have in opposition to this vain boast of Wil-liam's, the positive and solemn declaration of the testator, "*that he made the will himself.*"

The Surrogate. The first objection to the probate of the will relates to the manner of execution. The testatum clause does not recite a testamentary declaration, and it is urged that for this reason, proof of a testamentary declaration having in fact been made, is incompetent. I think other-wise. The statute does not require an attestation clause. The question is whether all the proper ceremonies were per-formed. If they were, and the witnesses prove it, the requi-sitions of the law are answered. The omission to recite at the end of the will any or all of the prescribed forms, can-not affect the validity of the instrument, because the recital is not required. If the omission does not invalidate the in-strument itself, I do not perceive why it should affect the proof of it. But it is said the testamentary declaration proved was not made *at the time* the testator subscribed the will. That he declared the instrument to be his last will and testament there can be no possible question. Mr. Wade says, however, that this declaration was made before he saw him subscribe the instrument. According to his statement, the course seems to have been this—the will was lying upon a table by which the decedent was seated—he took it up, introduced the subject, spoke of the defective exe-cution of the will of Thomas Lewis, which had then been

lately rejected, for want of a proper testamentary declaration—then declared the paper to be his last will and testament, signed it, requested the witnesses to subscribe, and saw them do so. I think this quite sufficient. The testamentary declaration was made at the time of signing—that is, on the same occasion and as part of the ceremony, though not at the very instant the testator was engaged in subscribing his name. Besides, Mr. Wade states expressly that when the testator asked him to witness the paper, he said, " I wish you to be witness to the signing of my *will*," and that he twice requested him to be a witness—once before he subscribed the document, and the second time when he signed. Again, Mr. Cox, the other subscribing witness, states that the testator made the testamentary declaration *after* he had signed the will, and not before. This would seem most probable, in view of the circumstance that the importance of the testamentary declaration was the subject of conversation, and a strict and literal construction of the statute was more likely to be observed. Having no doubt that the will was properly executed, and that the proof of the performance of the statutory requisites is sufficient, I pass to the other objections.

The will bears date the twelfth day of November, 1851, and the testator died on the sixteenth day of March, 1852, aged ninety years. His testamentary capacity is not controverted. Indeed, a prominent cause of complaint on the part of the contestant, is that he was improperly prevented from altering his will, or making a codicil, just previous to the close of his life. There is not only no evidence impeaching his mental vigor, but there is positive proof that his faculties were in an excellent state of preservation.

He had lived with his daughter, Mrs. Effie Simmons, a widow with two sons, for about six or eight years—or rather they had lived with him, he paying the household expenses. He left her an annuity of two thousand dollars, and the use for life of the leasehold dwelling house in Franklin street, where he resided, and a cottage in Williamsburgh. On her

decease, her sons are bequeathed each an annuity of eight hundred dollars.

His son William collected his rents in Williamsburgh, and seems to have had the free use of them. The testator gives to William absolutely three lots with two dwelling houses thereon in Williamsburgh, and then after providing for the support of his brother, cancelling all claims against his son, his daughter and her son William, and giving his son and daughter an equal interest in his furniture, books and family vault, he left the entire residue of his estate to his son William. This is undoubtedly an unequal will, preponderating very largely in favor of one branch of the family.

On the day of the execution of the will, the testator, in company with his daughter, proceeded to his son's house in Williamsburgh, and during Mrs. Simmons' temporary absence, the will was executed in the presence of the son and two witnesses called in by the son. The will is in William's handwriting. In view of all the circumstances it is very proper to look for evidence outside of the will indicating a recognition of its contents by the testator.

In the fall of 1849, the testator made a will, which he had drawn with his own hand. He stated to Henry Simmons that he had been making a new will—that his son-in-law, Mr. Strong, had read a former will, and he was dissatisfied. It is manifest from other evidence that he desired to keep the contents of his will secret. That this will of 1849 did not provide simply for a division of his property between his two children, seems probable from his statement " that he had been careful about making his will, he had taken a good deal of time to think it over, and he hoped it would be thought a just will." Robert Jones testifies, that in the summer of 1851 the testator told him he " had drawn his will himself, he had made William Leaycraft and William Simmons his executors—had provided for his brother John during his life, and that he should be buried in his vault." How far, in other particulars, the will of 1851 agreed with that of 1849 cannot be determined. One respect

in which it differed was the substitution of the daughter, Mrs. Effie Simmons as executrix, in the place of her son William. I conclude, from the evidence of Darlington and Weeks, that he had, or designed to have some portion of his estate placed in trust. Mr. Darlington states that towards the close of November or the first of December, 1851, the testator told him he had made his will, and left his daughter two thousand dollars a year, and her sons six hundred dollars per annum apiece. Catharine Simmons testifies that on the Saturday preceding the decedent's death she overheard a conversation between him and his son William. He said, "Effie is as much my child as you, and I am not satisfied the way my will is, as I wish to leave her and her heirs fast property." Uncle William made reply and said, "Why, pa, she is very well provided for. She has the interest of so much money, this house and the cottage." The day before the testator's decease, he made the following statement to Robert Jones : "I want to know from you if I can expunge part of my will by codicil?" Mr. Jones replied, "it was difficult to expunge—he would have to draw a line through the parts, and that would destroy the sense, but he might alter by codicil, and that would be equivalent to expunging." The testator answered, "I thought so," or "I think so myself." He then said, "I want to give my daughter Effie fast property in her own right, so that she can do as she pleases with it." Again, "he spoke in very warm and affectionate terms of his daughter—that he wanted to do more for her than he had done."

The testator's mind and memory appear to have been in good condition. I think there is sufficient evidence to show that he knew the contents of his last will, and it is observable that when William rehearsed to him the Saturday before his death what provisions he had made for his daughter, he expressed neither surprise nor dissent. Indeed, the very desire he indicated so earnestly to give her "fast property" implies knowledge of the manner in which he had limited her interest.

It is true the will was executed privately, but the testator at all times appears to have been desirous of keeping his testamentary intentions secret from some members of his family. There is no fact shown tending to establish that he was ordinarily subject to his son's influence, or that his mind and his will were not entirely free. The ceremony of executing the instrument was performed with apparent deliberation and with intelligence. He knew months afterwards what he had done, and never pretended that the will had been obtained by undue influence or fraud, or that he had not understood its provisions. He was well aware he had not made his daughter equal with his son; did not profess that it had been his intention to make them equal, or that it was even then, when he had determined to make a codicil, his intention to make them equal. After he had changed his mind, he did not propose to annul his will, but simply to modify it. That this design was defeated by the conduct of his son, to whom he had intrusted the custody of his will, is plainly proved, and I will consider the effect of that conduct hereafter. But there is nothing in the case, I can perceive, which affects the integrity of the original transaction, the execution of the will on the 12th of November, 1851. The circumstances attending the execution and the relations of the parties, called for some further recognition of the instrument and its contents, and it was supplied by the evidence. A change of intention several months after, cannot of itself, merely, impair the integrity of an act previously accomplished, validly performed, and, for aught that appears, consistent with the testator's intention at the time of performance. Had he complained of improper influences exerted, of imposition, deception, or ignorance of the contents of the paper, there would have been more ground for impeaching the transaction.

It appears, as already stated, that on the Saturday preceding his death, the testator told his son William he wished to alter his will, so as to make more favorable dispositions for his daughter. At this time he directed William to bring the will the next day, which he agreed to do. He did not come

on Sunday, though he had always been accustomed to visit his father on that day. The testator asked twice whether he had arrived, and said "he could see the reason why he stayed away." On Monday the testator sent for his friend Robert Jones, and had the conversation with him above adverted to, and expressed very great dissatisfaction that his son had not brought the will. Mr. Jones says, "I told him the lawyer could draw a codicil without the will. He said he supposed he might, but he wanted the will, so that he could show and point out what parts he wanted expunged, while they were making the codicil." On Monday afternoon the decedent signed a note to William, requesting him to bring the will without delay, or to send it sealed up. This producing no effect, early on Tuesday morning he sent William Simmons to Williamsburgh, with directions to see his son, and tell him "if he ever expected to see his father alive, he must come right over, and bring the will with him." Meanwhile Dr. Purple saw the decedent between 8 and 9 A. M., and told him he had not long to live; to which he replied, "he had some matters to attend to—that he wanted to be just to all, he wanted to make it all right, he wanted to make a codicil to his will, he wanted to erase some things from it and add some things to it." He at first requested the Doctor to sit down and draw a codicil, but on the suggestion that he had better send for a lawyer, concluded to wait till 11 o'clock, when "he expected his son over with the will." William arrived at 11 o'clock, but it does not appear that he had the will with him. At twelve o'clock the Doctor returned. There was some discussion between the two, in which the decedent did not participate—and about one o'clock the decedent breathed his last.

There can be no doubt that for several days before his decease Mr. Leaycraft was anxious to modify his will in favor of his daughter, and was led to postpone doing so by the expectation of obtaining the will, so as to accomplish his purpose with more precision. The conduct of the son is sought to be excused on the ground that he had reason to fear

the destruction of the instrument by his sister. Without expressing an opinion, whether there was substantial cause for such an apprehension, it is evident that he could have retained the control and custody of the instrument and still have met his father's wishes, by being present at the preparation of the proposed codicil. But however inexcusable was his conduct, can the prevention of the execution of a codicil by improper means revoke a previous will? It is obvious the testator did not desire to revoke his will entirely, but only to alter it. If he had desired to revoke it, the process was simple, and the actual possession of the instrument not at all requisite, or important. Though two suggestions by different persons to send for a lawyer, were made, he did not accede to them—nor did he give any clear indication what his views were, save that his daughter should have "fast property." Still, whatever was his intention, it was improperly defeated by a party deeply interested against the proposed alterations.

The civil law had very wise provisions to meet such a case, declaring the testament null with respect to him who hindered its revocation. This was on the ground of an offence against the testator—as attempting his life, procuring his death, failing to prosecute the authors of his death, attempting anything against his honor, treating for the succession without his knowledge, hindering him from making a testament or codicil, or revoking them—all of which were causes for declaring the heir *unworthy*, and excluding him from participation in the property of the deceased. (*Digest, lib.* 29, *Tit.* 6, § 1, 2, 3. *Domat, Strahan's ed.* § 2546, 2561, 3153). Says Domat, "We ought to reckon among the number of dispositions that ought to be annulled, that which a testator, being desirous to revoke, had been hindered from doing it by violence or some other unlawful way, on the part of those who were to reap advantage from the said dispositions: for with respect to them, they, by rendering themselves unworthy of the said dispositions, would render them null." Our statute has undertaken to prescribe the mode in which wills can be

revoked. "No will in writing" (except in cases of subsequent marriage, or marriage and issue, or an alienation of the estate) " shall be revoked or altered, otherwise than by some other will in writing, or some other writing of the testator's, declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, cancelled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person in his presence, by his direction and consent." (2 *Rev. Stat. p.* 64, § 42). This is the law by which I am governed in passing upon questions touching the revocation of wills. The whole of this subject is now regulated by statute, and a mere intention to revoke, however well authenticated, or however defeated, is not sufficient. Intention, to be effectual, must be actually carried into execution. The will therefore was not revoked, and if originally valid, must stand.

The testimony of Mr. Strong discloses somewhat of the testator's intentions and motives, and in that connexion I have not failed to consider carefully the state of the decedent's dispositions towards his grandchildren. But it is so difficult to place oneself in the position of another, observe the facts and circumstances on which he reasons, and understand and appreciate his motives, that it is dangerous to speculate in regard to the probability of his making his will in a particular way, unless under a very full and clear knowledge of every thing that might have influenced the testator's mind. And, even then men do not always come to the same conclusions upon the same facts. Circumstances which with one would lead only to securing to one branch of a family their equal share in trust, with another person may lead to a diminution of the share and an increase of the portion of others. It does not seem of any use to consider circumstances of that kind in the present instance. Where the testator's faculties were clouded, or much doubt exists, resort may be had to that class of probabilities, for want of a better guide. But

in this case the will is not shown to have been obtained by undue influence, circumvention or fraud in fact. A knowledge of its contents is traced to the testator after its execution, and no desire to modify it is evinced until a few days before his decease. There is nothing to impeach the vigor of his intellect, his volition and entire freedom of action ; and his will therefore stands as a reason for his acts. Inquiry into his reasons, and conjecture as to his motives, are useless. It is my opinion the will should be admitted to probate.