In the Matter of the Estate of ABRAHAM GOLDBERG, Deceased.

Surrogate's Court, Kings County, October 8, 1935.

*Philip Twersky* [*I. Gainsburg* and *Irving N. Klein* of counsel], for the executors.

*Maurice Brandt* and *Victor Levin*, for Pauline Goldberg, widow.

*Henry C. Turner*, special guardian.

*Samuel Fischer*, for the claimant, William S. Collins.

*Abraham I. Wolf*, for the Hebrew School of Williamsburgh.

WINGATE, S.  The main question for determination in this contested acccounting is one of first impression and involves the effect on the will at bar of the amendments to section 35 of the Decedent Estate Law which were made by chapter 459 of the Laws of 1932.  This question is raised by the widow's prayer for a construction of the will, the issue being whether the document, which was executed on June 8, 1930, and admitted to probate on April 29, 1933, was revoked as to the widow by the intermediate intermarriage of the testator with the widow, which occurred on June 18, 1930.

The learned referee (Edward J. Connolly, Esq.) has rendered a gratifyingly complete and painstaking report in which he answers this question in the negative.  His result is founded upon his determination that prior to the marriage the decedent and the widow entered into an agreement by the terms of which the testator undertook to bequeath to the widow the sum of $5,000, payable to her if she survived him, and to her children by a former marriage if she predeceased him, while she, in return, agreed to marry him and to make no claims upon his estate beyond this testamentary benefit.

While it is conceded by all that no written agreement to this effect was ever made, the learned referee deems that the credible testimony adduced before him establishes that a parol agreement

to this effect was consummated, and has given effect to it on the theory that it was fully executed by both parties thereto.

The only relevant undisputed facts in the case are that the will was executed on June 8, 1930; that the parties intermarried on June 18, 1930; that the testator died on April 1, 1933, survived by the widow, and that the will in question contained the following provisions:

"9. I hereby give and bequeath unto Pauline Silverstone, the sum of Five Thousand ($5,000.00) Dollars, provided however the said Pauline Silverstone shall become my wife. It is my intention that if, for any reason whatsoever the said Pauline Silverstone shall not join me in marriage and shall not become my lawful wife, that then, in that event, the said bequest of Five Thousand ($5,000.00) Dollars to her given by the terms of this will shall not be paid to her, but shall become part of my residuary estate and shall be disposed of as is provided in paragraph '11' of this will. In the event the said Pauline Silverstone shall join me in wedlock, the provision herein to the said Pauline Silverstone, as aforesaid, I hereby declare is intended to be and is so given to her in full satisfaction and in lieu of and for her dower which she may or can in anywise claim or demand out of my estate.

"10. In the event that the said Pauline Silverstone shall have joined me in marriage and shall thereafter and before my demise, die, it is my request that the Five Thousand ($5,000.00) Dollars mentioned in the preceding paragraph of this will, shall be paid upon my death, share and share alike to the children of said Pauline Silverstone, to wit Jean Winkler and Evelyn Hodge."

The finding respecting the making of the agreement is based on conflicting testimony. In view of the familiar principle that the determination of the credibility of witnesses is primarily one for the trier of the facts who has seen and heard them (*Matter of Dreyer*, 153 Misc. 624, 625; *Matter of Suderov*, Id. 214, 215, and authorities cited), the court will not interfere with the result attained, especially since there is ample testimony in the record to support the referee's findings.

The decedent, at the time of the transactions, was a widower in his sixties. His last unmarried child had recently married and he expressed a feeling of loneliness. Through the offices of an intermediary, he had met a widow of approximately fifty years, and felt matrimonially inclined. Apparently the object of his inclinations desired financial assurance to the extent of $10,000, although the time and place of her expression of this wish was not disclosed. In any event, the prospective bridegroom sent a friend to call on the lady with an eye to her housekeeping and for the purpose of

informing her that a $5,000 bonus was his limit and that if she was satisfied with this that he would like to have her come to see him, otherwise not. She stated that this was agreeable, and went. As a result, a will was drawn and executed leaving her $5,000 in full of all claims against her prospective bridegroom's estate in the event that the marriage was consummated. This was read to her at a family gathering and a copy given to her. As originally drawn, it provided that in the event of her marriage to, and predecease of, the testator, the $5,000 bequest should fall into the residue of the estate which passed to the testator's children by his first marriage. The prospective bride expressed dissatisfaction with this provision, insisting that in such an eventuality the $5,000 should go to her own children. Accordingly a second will was drawn and executed, effecting this change. This was again read to her at a family gathering, and she expressed her complete satisfaction with the arrangement. Thereafter the parties intermarried.

By reason of this demonstration of the knowledge of the widow of the contents of the will which, as noted, provided that she or her children should receive $5,000 " in full satisfaction " of her claims against the decedent's estate, her subsequent statement that " everything was satisfactory " and, finally, her marriage to the decedent, the referee has found an affirmative agreement on her part that she would make no claim against the estate other than for the $5,000 bequest contained in the instrument.

This conclusion appears entirely sound, since " unquestionably acceptance " of a proposed agreement " may be indicated by conduct or acquiescence " (*Barber-Greene Co., Inc.*, v. *Dollard, Jr., Inc.*, 239 App. Div. 655, 658). Here, it had been emphatically brought to the attention of the prospective bride that no marriage would take place in case she insisted on receiving more from testator's estate than $5,000. The arrangement for the mode of payment of this sum was altered in the manner desired by her, she expressed her satisfaction therewith and entered into the marriage.

Viewing the matter solely from the standpoint of abstract justice and equity, it would be little short of monstrous were a determination necessary that this woman who entered into this arrangement with her eyes wide open, fully conversant with the facts, and obviously alert to obtain the greatest personal advantage possible from the situation of the testator and his desire for companionship in his declining years, should be permitted to repudiate the arrangement into which she voluntarily entered and divert a much greater sum from the desired recipients of the testator's bounty than that which it was mutually agreed she should have

and to which she initially assented with "satisfaction" if not indeed with alacrity. A return of the parties to their *status quo ante* is entirely impossible and if thus employed, the Statute of Frauds would serve as a veritable bulwark of protection for fraud.

An evaluation of the present situation of the parties turns, in the first instance, upon an analysis of the mutual rights and obligations of the testator and the present widow immediately succeeding the consummation of the marriage. The learned special guardian adopts the position that the agreement between the parties was initially within the provisions of subdivision 3 of the Statute of Frauds (Pers. Prop. Law, § 31), yet that it later achieved validity by reason of its complete execution by both parties. The authorities upon which he relies in support of his contention are *Adams* v. *Swift* (169 App. Div. 802); *Mutual Life Ins. Co.* v. *Holloday* (13 Abb. N. C. 16, cited with approval in *Adams* v. *Swift*); *Lyons* v. *The Maccabees* (192 App. Div. 109), and *Miller* v. *Sire* (224 Fed. 424).

So far as presently pertinent, this subdivision of the Personal Property Law reads:

" Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: *   *   *

" 3. Is made in consideration of marriage, except mutual promises to marry."

A brief review of the authorities upon which the special guardian relies, and which have been accepted by the referee as pertinent binding precedents, is in order.

*Adams* v. *Swift* was an action in the Supreme Court by a surviving wife to establish the validity of a will of her deceased husband. The demonstrated facts were that the husband, prior to the marriage, had agreed with the plaintiff that if she would marry him, he would make a will leaving all his property to her. She agreed to this arrangement, fulfilled her part of the bargain by marrying him and he executed the will, which was the one the validity of which plaintiff sought establishment.

Subsequently, the husband executed another will which recited that he had made *inter vivos* gifts of a large part of his property to his wife, revoked the will made pursuant to the agreement, and and left all his remaining property to another. The court held (p. 805) that since the ante-nuptial agreement had " been fully executed by the marriage and the subsequent making of the will " it " became a valid, binding and executed contract; that the first will was irrevocable, and that any subsequent will was invalid for lack of power of the testator to execute it."

The factual situation upon which the result is predicated is tersely summarized by the court at page 807: "A pre-nuptial agreement that if plaintiff would marry the testator he would leave all his property to her by will; an acceptance of the proposal; a fulfillment of the agreement on plaintiff's part by marriage; a fulfillment of the agreement by testator by the making of such a will as he had agreed to make. Here then was an agreement entirely completed by both parties in so far as it was possible to complete it."

It is apparent that the result in this case, as is necessary in the case at bar, was predicated on the assumption by the court of an implied covenant by the parties that having entered into, and executed, the agreement by the performance of the stipulated acts, neither could thereafter do anything which would deprive the other of the benefit of the bargain which had thus been consummated. It would appear from the demonstrated facts that such an implied agreement was less strong in respect to the husband in *Adams* v. *Swift* than upon the present widow. If this is correct, it would follow as an *a fortiori* matter that the latter would here be estopped to assert a right to any benefit in excess of that which she had agreed to accept in complete satisfaction.

The same underlying principle runs through the other authorities upon which the special guardian and the referee place reliance. In *Mutual Life Ins. Co.* v. *Holloday* a husband deeded certain land to his wife on a parol agreement that she should devise it to him in her will. She actually executed such a will. She later made another will leaving it to others. It was held that the agreement although originally void by reason of the Statute of Frauds, had become fully executed by the transfer and the execution of the will, thus effectually preventing the transferee from making a valid subsequent will diverting it to others. In *Lyons* v. *The Maccabees* a prospective husband induced plaintiff to marry him in reliance upon a parol agreement, which he fulfilled, to make her the beneficiary under a certain policy of insurance. It was held that the agreement was consummated by the marriage and designation of beneficiary and that the insured could not thereafter validly substitute another payee of the proceeds of the policy. *Miller* v. *Sire* presented substantially identical facts except that the inducement for the marriage was an assignment of a mortgage, which took place substantially simultaneously with the marriage.

In the last cited case, Judge LACOMBE, writing for the Circuit Court of Appeals for the Second Circuit, says (at p. 425): " As we understand this statute and the decisions under it, it provides that, in the specified cases, a party to an alleged contract cannot enforce its execution if it be oral only. When, however, the oral

contract has been fully carried out according to its terms, it is an accomplished fact, and the statute of frauds no longer cuts any figure in the transaction. That such is the view of the state Courts seems manifest from the many authorities which hold that the statute of frauds is a *defense*, which to be availed of must be pleaded. When the statute says the oral contract is *void*, it seems void between the parties to it. When the parties carry it out *fully*, it ceases to be void when *part* consideration is paid."

To this enunciation of principles may be added certain language from *Mutual Life Ins. Co.*, v. *Holloday* (13 Abb. N. C. 16, 24) which is quoted with approval by the Appellate Division in *Adams* v. *Swift* (169 App. Div. 802, at p. 808): " If the agreement was valid in law and in equity, it would be a mockery of justice to say that having executed the will, she fully satisfied her part of the agreement, and was at liberty to revoke it the next day. The right secured by her husband was substantial, and could not be defeated by another will. The spirit and true intent of the agreement, under which she became seized of and enjoyed the estate, obliged Mrs. Holloday to adhere thereafter to the terms of the devise in her husband's favor. * * * If one of the contracting parties induces the other so to act, that if the contract be abandoned he cannot be restored to his former position, the contract must be considered as perfected in equity and a refusal to complete it is in the nature of a fraud * * *. To defeat this conclusion, it cannot be insisted that a will is in its own nature ambulatory and revocable during the life of the testator. That statement, true in itself, can have no application to a case where the testator has obligated himself by a valid agreement founded upon a good consideration, which is wholly inconsistent with the making of another will, by which he should attempt to devise the property, the subject of the agreement, to others than the person from whom the consideration proceeded, and to whom he was bound by the terms of the agreement to devise it. ' Indeed, the doctrine of the revocability of a will amounts merely to this, that a will is ambulatory during the lifetime of the testator, provided he has not bound himself not to change it.' (1 Jarman on Wills (5th Am. ed. by Bigelow), 18, note.) * * * The absolute right to dispose of property, as the testator may elect at any time during life, may be abridged or modified by express contract, as other rights often are. And the obligation not to revoke or change a will, although negative, is as much involved in the agreement as the affirmative duty to devise in a certain way."

If it be granted, therefore, that the original agreement between the testator and the widow in the case at bar was actually within

the quoted subdivision of the Statute of Frauds, it seems apparent that these authorities sustain the position that their acts executed the agreement, thereby removing the applicability of the statute, with the result that from the moment of the consummation of the marriage, each possessed the definite rights and obligations which their engagement contemplated. Certainly, the testator, on the direct authority of these decisions, would not have been permitted to change his will so as to limit the widow's bequest to say $1,000, or divert the remainder, in case of her predecease, to his children instead of hers, and conversely, her engagement should be held to preclude her from asserting a claim to a greater portion of the estate than that which she had agreed to accept in satisfaction, and which had been provided for her in the will.

Whereas the foregoing may and probably does furnish a conclusive affirmative answer to the question of whether the parties, immediately succeeding the consummation of the marriage, were validly bound by an enforcible contract, the court is not wholly satisfied that the agreement, as originally made, was essentially one " in consideration of marriage " within the true intendment of subdivision 3 of section 31 of the Personal Property Law, but deems it one rather in *contemplation* of marriage.

The original agreement contemplated three covenants on the part of the prospective husband, and two on that of the putative bride. The agreements of the former were: (1) That he would marry the latter, (2) that he would make a will leaving $5,000 to her if she survived him, and to her children if she did not, and (3) that he would not revoke the will so made, this latter being implied by law. In return, the lady agreed: (1) To marry the testator, and (2) to make no claim on the settlement of his estate for a sum greater than that provided by the will, which covenant, also, is implied by law from her conduct. While the agreements first enumerated in each instance possessed undoubted importance, they were unquestionably subsidiary in the minds of the parties, who were mainly intent on effecting an amicable settlement in advance of the property rights which the prospective wife should have if the marriage were consummated. This consummation was, therefore, rather a condition precedent to the effectiveness of the property settlement which was made than a consideration therefor.

In this situation the authority of *Dygert* v. *Remerschnider* (32 N. Y. 629) becomes of extreme pertinence. In that case the prospective husband owned a small piece of land, but was heavily indebted. The would-be bride was possessed of some money. It was verbally agreed between them that they should intermarry, that she should pay his debts and that he should convey the parcel of real estate to her.

The parties duly intermarried and the wife paid all of the husband's existing debts. He, however, delayed the conveyance of the real estate to her until a time when he had incurred some additional indebtedness, but then performed this part of his agreement. The transfer was attacked by a later creditor as being in fraud of his rights. The result favored the wife. The opinion of Judge WRIGHT reads in part (at p. 638): "If this were an agreement simply to convey the real estate in question to her, in consideration of marrying Remerschnider, being by parol, it would be void by the statute of frauds (2 R. S. 135, § 2), and any conveyance or transfer of the property, after marriage, in pursuance of such void agreement, it may be conceded, would be, as against existing creditors of Remerschnider, in contemplation of law, voluntary. * * * Now, this was not a marriage contract only, or rather one where marriage was the single consideration, and necessarily falling within the condemnation of the statute of frauds, not being in writing. I think, it may be rightly regarded as an agreement for the purchase of the real estate between parties, at the time, legally competent to enter into it. *Adding to a money consideration that of marriage, I think, did not alter its character of a contract of purchase; and intermarriage subsequently*, as respected Remerschnider, *gave to it no other and different legal effect.* After marriage, as before, it subsisted * * * and might have been enforced in equity, against Remerschnider, though he became her husband, after full payment of the purchase money, viz., his debts." (Italics not in original.) Decisions to similar effect may be found in *Houghton* v. *Houghton* (14 Ind. 505, 507); *Rainbolt* v. *East* (56 id. 538, 539); *Wright* v. *Jones* (105 id. 17, 25; 4 N. E. 281); *Gackenbach* v. *Brouse* (4 Watts & S. [Penn.] 546, 547), and *Riley* v. *Riley* (25 Conn. 154, 159, 160).

It appears to the court that this principle is directly in point in the case at bar. Three considerations moved from the testator to the widow by their agreement, in return for which she agreed not only to marry him, but to refrain from an act potentially detrimental to his estate, namely, that of interposing a claim upon the settlement of his estate in excess of the agreed testamentary benefit. Paraphrasing the language of Judge WRIGHT, the addition of the consideration of marriage, if it actually was a consideration, did not alter the character of the contract on her part to pursue a certain line of conduct, namely, to refrain from performing a certain act. Since the obligation to perform this negative act, if the phrase may be pardoned, " was not one which by its terms was not to be performed within a year from the time it was made," it was not within the Statute of Frauds. (*McCabe* v. *Green*, 18 App. Div. 625.) (See, also, *Trustees, etc.*, v. *Brooklyn Fire Ins. Co.*, 19 N. Y. 305, 307;

*International Ferry Co.* v. *Am. Fidelity Co.*, 207 id. 350, 353.) The contract in this aspect was, therefore, wholly valid when made, and inevitably so continued after the marriage was consummated.

On whichever ground the decision be based, it is obvious that on and after June 18, 1930, the wife possessed a vested contract right to restrain the decedent from altering the testamentary arrangement for her benefit and that of her children, which had been incorporated in his will, and the husband was the owner of an equally vested right to restrain her from claiming from his estate anything in excess thereof.

This brings the discussion to the consideration of the effect, if any, which the subsequent changes in section 35 of the Decedent Estate Law produced upon the rights and obligations of the parties. At the time of the making of the agreement, the execution of the will and the intermarriage of the parties, this section read as follows:

" Revocation by marriage. If after making any will, such testator marries, and the husband or wife, or any issue of such marriage, survives the testator, such will shall be deemed revoked as to them, unless provision shall have been made for them by some settlement, or they shall be provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; * * * and such surviving husband or wife, and the issue of such marriage, shall be entitled to the same rights in, and to the same share or portion of the estate of said testator as they would have been, if such will had not been made. No evidence to rebut such presumption of revocation shall be received, except as herein provided."

Effective on March 28, 1932, almost two years after the hereinbefore noted transactions between the parties, and about a year prior to the death of the testator, this section was amended to read as follows:

" Revocation by marriage. If after making any will, such testator marries, and the husband or wife survives the testator, such will shall be deemed revoked as to such survivor, unless provision shall have been made for such survivor by an ante nuptial *agreement in writing;* and such surviving husband or wife shall be entitled to the same rights in, and to the same share or portion of the estate of said testator as he or she would have been, if such will had not been made. Such husband or wife shall be entitled to such share or portion of the estate from the devisees and legatees in proportion to and out of the parts devised and bequeathed to them by such will. *No evidence to rebut such presumption of revocation shall be received, except to show the existence of such ante nuptial agreement.* This section as amended shall apply only to wills executed prior to September first, nineteen

hundred thirty; and wills executed after such date shall not be affected in any way by the provisions of this section as heretofore contained or as amended." (Italics not in original.)

The purpose of the Commission to Investigate Defects in the Laws of Estates, which proposed the change, was to remove the uncertainty which had previously existed under the former enactment as to whether or not a testator who made a gift to one with whom he subsequently intermarried, did so in contemplation of the change in status which later occurred. In the former situation it had been held that the will was not revoked by the subsequent marriage, while in the latter it was. (See *Matter of Scolpino*, 231 App. Div. 690; *Matter of de Coppet*, 142 Misc. 816; affd., 237 App. Div. 810; *Matter of Bent*, 142 Misc. 811.) The Commission felt that " the determination of all these questions leaves too much latitude to the individual interpretation of the courts and substitutes discretion for what should be an absolute statutory rule. The law of inheritance should be as far as possible fixed and definite. *The amendment proposed by the Commission fixes the subsequent marriage as the sole test of revocation.*" (Italics not in original.) (See note to chap. 459 of Laws of 1932.)

It cannot be denied that this regulation of the power of testamentary disposition was wholly within the authority of the Legislature. The right to transmit property on death is a creature of positive law and not a natural right (*Matter of Bergdorf*, 206 N. Y. 309, 316; *Sultan of Turkey* v. *Tiryakian*, 162 App. Div. 613, 615; affd., 213 N. Y. 429; *Knowlton* v. *Moore*, 178 U. S. 41, 55; *Matter of Barbour*, 185 App. Div. 445, 457; *Matter of Greenberg*, 141 Misc. 874, 887; affd., 236 App. Div. 733; affd., 261 N. Y. 474; *Matter of Killough*, 148 Misc. 73, 85), and is, therefore, solely within the legislative control of the State. (*United States* v. *Perkins*, 163 U. S. 625, 627; *Matter of Mullin*, 143 Misc. 256, 257), wherefore its laws may place such conditions or limitations thereon as its policy may dictate, or may even abolish any right whatsoever to transmission of property on death. (*United States* v. *Perkins*, 163 U. S. 625, 629; *Mager* v. *Grima*, 8 How. [U. S.] 490, 493.)

Obviously the greater includes the lesser and since the Legislature might abolish the right of testamentary disposition altogether, it may abolish it partially or conditionally in given cases and under specified circumstances. That is precisely what has occurred in the present instance. It has in effect provided that a married person may not make a testamentary disposition of a certain portion of his property unless the will was executed subsequent to his marriage, if he has made no written ante-nuptial agreement providing for his wife.

This, however, does not aid the widow at bar, since by reason of her agreement with the testator to claim nothing in excess of the testamentary benefit, she has debarred herself from taking under the statute in excess of the amount bequeathed. The Legislature did not and could not, without constitutional infringement, give her any rights in derogation of the vested contract rights which the testator and his estate had already acquired at the effective date of the enactment. (*Ralph* v. *Cronk*, 150 Misc. 69, 70; affd., 241 App. Div. 907; affd., 266 N. Y. 428; *Davis* v. *Supreme Lodge Knights of Honor*, 165 id. 159, 170; *McGahey* v. *Virginia*, 135 U. S. 662, 685, 693; *Collidge* v. *Long*, 282 id. 582, 595, and authorities cited.)

The enforcement of her contract against her is merely another instance of the exercise by a court of equity of its unquestioned power to refuse the enforcement of any right which would amount to the consummation of a fraud. (*Adams* v. *Gillig*, 199 N. Y. 314, 322; *Freeman* v. *Freeman*, 43 id. 34, 38.) Here the widow achieved her status as wife solely as a result of her representation to the decedent that the testamentary gift would be accepted by her in full of all claims against him or his estate. Having achieved her present position by reason thereof, an alteration of her attitude amounts in effect to a fraud upon him and his estate.

A final word is necessary respecting the inclusion in the amendments to section 35 of the provision precluding the introduction of any evidence other than the demonstration of the existence of a written ante-nuptial agreement. Whereas this portion of the enactment is in terms procedural only, it would, if held to preclude the admission of evidence to show the existence of valid vested contract rights, such as are here present, be wholly destructive of such rights themselves. While it is within the power of the legislative branch of the government to effect ordinary procedural changes, these may not, without constitutional infringement, be carried to a point where they effect the destruction of rights which have theretofore accrued. To the extent, therefore, that this enactment inhibits the introduction of any relevant evidence to demonstrate the consummation of a valid contract, it must be held in contravention of article 1, section 10, paragraph 1, of the United States Constitution and accordingly void. (*Edwards* v. *Kearzey*, 96 U. S. 595, 607; *Tennessee* v. *Sneed*, Id. 69, 74; *Louisiana* v. *New Orleans*, 102 id. 203, 206, 207; *Walker* v. *Whitehead*, 16 Wall. [U. S.] 314, 317, 318; *Ralph* v. *Cronk*, 150 Misc. 69, 70; affd., 241 App. Div. 907; affd., 266 N. Y. 428; *Matter of Cohen*, 149 Misc. 765, 780.)

It follows that in the determination upon the question of construction of the will, which is raised merely by the widow, and in which no other party joins, the decision must be that she is entitled to receive the sum of $5,000 and nothing more.

In only one respect is the court inclined to disagree with the results attained by the learned referee in his comprehensive report. This concerns the moneys paid by the executors from the estate funds to the Abgold Realty Company. This corporation was organized by the testator in or about the month of May, 1930, for the purpose of taking title to certain real property which he had previously owned and operated. All of the issued stock of the corporation belonged to the decedent, and there is evidence in the record to the effect that after the transfer of the real estate to the corporation, the decedent treated and conducted the properties and the proceeds therefrom in precisely the same manner as that in which he had conducted them during the period in which title stood in his own name. It may be inferred from the record that the testator acquired and held these properties rather as an investment than as a business. In this situation, with the testator and his estate in fact the complete owners of the property, the principles enunciated in *Matter of Steinberg* (153 Misc. 339, 346, 347) become applicable, and the property should be considered on the same plane as if title thereto had actually been in the testator at the time of his death.

On this basis, payments made for the reasonable preservation of this portion of the property of the estate would be not only proper but obligatory. No analysis of these expenditures has been submitted, for which reason the court is unable presently to determine whether the acts of the executors in this regard exceeded this limitation. All that the court decides in this connection is that under the facts of this case, the transfer of these properties to a wholly owned corporation did not insulate them from the other assets of the estate. If the special guardian desires to press any part of his objection to the expenditures in view of this determination, the matter will again be referred to the referee to hear and report on the subject.

The salary paid to one of the executors for the management of the properties was clearly improper and was properly disallowed by the referee. In the event, however, that the amount of rentals personally collected by him is capable of computation, he may be allowed a commission of five per cent thereon as an offset against the surcharge. In the event that a showing in this regard is possible and the parties in interest are unable to agree upon the proper

amount thus allowable, this question will also be remitted to the referee.

The court cannot but commend the learned referee and the distinguished special guardian for their extremely helpful contributions in the determination of a somewhat unusually troublesome litigation.

Except as herein expressly modified, the report of the referee will be in all respects confirmed.

Proceed accordingly.