In the Matter of the Estate of JOHANNE B. M. MORTENSEN, Also Known as JOHANNA MORTENSEN, Deccased.

Surrogate's Court, Kings County, January 9, 1936.

*Manfred Nathan,* for the proponent Peter Jensen, as president of the Danish Benevolent (Danmark) Society.

*Litchfield F. Moynahan,* for the contestant Ernest B. Burke, also known as John Mortensen.

*Peter A. Peterson,* for Peter A. Peterson, as executor under a prior will.

WINGATE, S.  The present contested probate affords a welcome variation from the usual routine aspect of such a proceeding. The objections to probate are three in number, and attack the factum of the will, assert that it was secured by fraud and undue influence, and, finally, maintain that if duly and validly executed, it was impliedly revoked by virtue of certain transactions which occurred subsequent to its execution.

The sole contestants are an unrelated legatee under a prior will and the executor named therein.  The testimony of a majority of the witnesses produced by the opposing parties exhibited bias to the point of positive untruthfulness, but in spite of this fact, it is possible by a judicious sifting of their statements to obtain a reasonably clear picture of the decedent and of the pertinent transactions respecting the propounded instrument.

At the time of her death on April 15, 1935, the decedent was a childless widow, approximately sixty-eight years of age.  Her

outstanding characteristic appears to have been unostentatious philanthropy. Her chief extramural activity, as reflected in the record, was in connection with the affairs of the Danish Benevolent Society, Danmark, of Brooklyn, N. Y. The duration of her interest in this society was not accurately disclosed, the testimonial demonstration being merely to the effect that she had been a director of the Home for the Aged maintained by this institution for over fifteen years. That this was an understatement of the period of her active association with the organization appears obvious from the revised certificate of incorporation of the society, executed on September 23, 1915, in which the name of the decedent appears as a director thereof, demonstrating that more than nineteen years prior to her death she had already achieved prominence therein and was actively engaged in its work.

Her second benevolent activity was the taking into her home of a series of young children, largely unrelated to her by blood or marriage, and her support and training of them through their years of infancy and adolescence. This she did with three different individuals, the first, James P. Mortensen, whom she brought up from the age of one and one-half years; Ernest B. Burke, whose charge she assumed when he was four years old, and who was still at least partially dependent upon her at the time of her death, when he had already attained adulthood; and Emily Blackwell, the orphan child of a deceased relative, who came to live with her at the age of six and remained until the date of her marriage. None of these children were legally adopted by her.

The second named of these children, Ernest B. Burke, is the chief contestant of the presently propounded document.

Much testimony was introduced on the trial respecting the misconduct of this last-named individual, and of the decedent's resentment thereat. Even though full credence be not given to the more sensational charges made against him, it appears obvious that his conduct during the early part of 1934 furnished at least a contributing cause to the subsequent actions of the alleged testatrix. In any event, it is clear that in the summer of 1934 she had become thoroughly discontented with her manner of life and associations. She was living in a small house in Brooklyn, which she owned, and where Burke, who appears to have been seldom employed, lived with her. In the early part of August she determined to break up this menage and to enter the Old Peoples' Home maintained by the Danish Benevolent Society, with which she had so long been identified. To this end she made out an application for admission to the Home and set in motion the usual formalities necessary to procure her admission. On September 8, 1934, a meeting was had

between her and the committee appointed by the directors of the Home to pass upon her application. She was favorably considered and her application accepted.

At this time her assets appear to have consisted of the house in which she lived and of approximately $11,000 deposited in four savings banks. It was arranged that she should pay the Home the sum of $2,500 as an admission fee, and this was accomplished on or about October 1, 1934, at which time she also erected two Totten trusts, the one of $5,000 for the benefit of James P. Mortensen, and the other of $2,000 for Ernest B. Burke. She also conveyed the house in which she was living to her niece, Mrs. Emily Blackwell. The result, so far as may be deduced from the figures in the record, therefore, is that at this time she substantially divested herself of all assets with the exception of approximately $1,500, and in so doing made provision for the three persons whom she had reared from infancy and in whose welfare she was presumably solely interested. She became an inmate of the Home on October 19, 1934.

The by-laws of the society provided that in addition to the payment of an agreed entrance fee, each inmate of the Home should make an assignment thereto of all his or her property.

According to the testimony adduced at the trial, the practice in this regard had been habitually varied in that, in place of an assignment, the inmate was called upon to make a will leaving all his or her property to the Home. For this purpose, a simple half page document was employed. It consisted of three dispositive paragraphs, the first directing payment of debts, funeral expenses, etc., the second giving all property of the person in question to the Home and the third appointing the president of the society the executor of the will. This form was printed in facsimile typewriting characters of ordinary pica size, blanks being left for filling in the name of the particular testator or testatrix, and the date of the execution.

On November 2, 1934, the decedent signed such a form, the blanks in which had previously been filled by the president of the society.

The contestants strongly attacked the proof of due execution of this document. It is true that the testimony of the subscribing witnesses in a preliminary examination differed in certain particulars from their evidence as given on the trial. The court is, however, entirely satisfied with the explanation of these differences given by the witnesses themselves to the effect that they became confused in the course of their examination respecting the differentiation between the events that transpired at the preliminary meeting with the decedent on September eighth, and the subsequent meeting on November second, at which time the document was executed, and the court is fully satisfied that the events which transpired on

November second fully complied with the requirements of section 21 of the Decedent Estate Law respecting the manner of execution of a will.

It is also strenuously contended by the contestants that the decedent was unaware of the nature or contents of the document which was then signed by her, in which connection stress is laid upon the alleged defectiveness of her eyesight. It was, however, demonstrated that by the use of the glasses which she then employed, she had substantially normal vision and the record is replete with testimony to the effect that subsequent to the time of her acquisition of these glasses, she constantly read newspapers with their aid, although previously, when she was using glasses purchased at a five and ten cent store, she had also employed a magnifying glass to assist her in so doing.

It is furthermore incredible that the testatrix, who, for approximately a generation had been actively engaged in the work of the society as a director thereof, was not entirely familiar with its established practice in respect to the execution of an instrument conveying the property of an inmate to the Home; or that she was not, quite aside from the perusal which she then made of the document which she signed, familiar with the terms of the instrument itself. On the record as a whole, therefore, the court is completely satisfied that the propounded instrument was validly executed by the testatrix on November 2, 1934, that at the time of its execution all statutory formalities were observed and that she was then fully competent to make a will and knew the contents of the will which she made.

The subsequent events in respect to the testatrix, whereas interesting, are, in the opinion of the court, of no present pertinence.

She apparently became dissatisfied with the Home and left it on November twentieth, never to return. The president of the society testified to statements by her to the effect that her departure was merely temporary and that she was expected to return. These statements, however, if actually made, appear to have been an inaccurate expression of her intention, since she promptly procured a reconveyance of her real property to herself from her niece, and after experiencing some difficulty in obtaining a return from the Home of the $2,500 which she had paid as entrance fee, employed an attorney for its recovery.

During the course of the negotiations between the attorney and the Home, it was finally arranged that the latter should refund a total of $2,000, the remaining $500 of the entrance fee being considered as a donation by the decedent to the Home.

It is the contention of the contestants that the settlement which was then effected constituted a complete rescision of all arrangements between the decedent and the Home, and that, as a result, the presently propounded instrument must fail of probate. Whereas there may be merit in the contention that the transactions which took place in connection with this compromise adjustment amounted in effect to an agreement by the Home that the $500 of the entrance fee retained by it should be the full extent of its beneficial enjoyment of the property of the decedent, this in itself would furnish no reason for a denial of probate of the validly executed will of November second. It may well be held at some future time when the question is directly presented that a trust would be impressed upon the assets of the estate in the hands of the executor in favor of those persons who would have been entitled to take had the will of November second been revoked in the manner authorized by statute.

Such a result, if attained, would be analogous to that recently discussed in *Matter of Goldberg* (157 Misc. 49), in which the conduct of the parties was held to have consummated an agreement that the wife should claim no rights in excess of a specified sum. This question, however, is not presently before the court for decision, since it concerns only a question of devolution of the property of the estate and not one of admissibility of the will to probate.

At this time the sole inquiry is as to whether the will was executed with the required statutory formalities by a competent testatrix, in accordance with the dictates of her own volition. Since these questions have been answered in the affirmative, admission of the instrument to probate is obligatory upon the court (*Matter of Davis*, 182 N. Y. 468, 474, 475; *Matter of Webb*, 122 Misc. 129, 133; affd., 208 App. Div. 793; *Matter of Enright*, 138 Misc. 853, 855, 856; *Matter of Ayres*, 141 id. 236, 237) unless it be demonstrated that the instrument was subsequently revoked by one of the modes authorized by statute (Dec. Est. Law, § 34). The doctrine of implied revocation is not recognized in this State (*Matter of Simpson*, 155 Misc. 866, 868), and, it seems, even where the performance of the acts prerequisite to revocation under the statute has been prevented by fraud, which is not here the case, the will must nevertheless be admitted to probate (*Matter of Evans*, 113 App. Div. 373, 374, 375; *Matter of McGill*, 191 id. 76, 82; affd., 229 N. Y. 405; *Matter of Bush*, 134 Misc. 494, 498; *Leaycraft* v. *Simmons*, 3 Bradf. 35, 44), and the circumvention of the fraud remitted to the time of the accounting.

Even were the determination in this regard to the contrary, however, it could not aid the present contestants. In view of the

determination that the will of November second was validly executed it follows, since it contained a clause revoking all former wills, that the previous will under which alone the contestants attain any *locus standi*, was revoked thereby with the same effect as if it never had been executed. (*Matter of Ten Eyck*, 155 Misc. 443, 444.) The revocation of the later instrument, if actually accomplished, would not revive the former. (*Matter of Ford*, 135 Misc. 630, 633; *Matter of DeCoster*, 150 id. 807, 811; *Matter of Ten Eyck*, 155 id. 443, 444.)

It follows that the devolution of the property of the decedent is no concern of the contestants whatsoever, since they are not statutory distributees of the decedent.

The motion of the proponent for a dismissal of the objections must, accordingly, be granted, and the will admitted to probate.

Enter decree on notice.